# STEPHENS *v.* CHEROKEE NATION.

# CHOCTAW NATION *v.* ROBINSON.

# JOHNSON *v.* CREEK NATION.

# CHICKASAW NATION *v.* ROBINSON.

APPEALS FROM THE UNITED STATES COURT IN THE INDIAN TERRITORY.

Nos. 428, 453, 461, 496.  Argued and submitted February 23, 24, 27, 1899. — Decided May 15, 1899.

Congress may provide for a review of the action of commissioners and boards created by it and exercising only *quasi* judicial powers, by a transfer of their proceedings and decisions to judicial tribunals for examination and determination *de novo.*

.The statute conferring jurisdiction upon this court to consider and act upon this class of cases was intended to operate retrospectively, and is not thereby rendered void.

The validity of remedial legislation of this kind cannot be questioned unless it is in violation of some provision of the Constitution.

The appeals to this court granted by the act extend only to the constitutionality or validity of the legislation affecting citizenship or the allotment of lands in the Indian Territory, and the limitation applies to both classes of cases mentioned in the opinion of the court, viz.: (1) citizenship cases; (2) cases between either of the Five Civilized Tribes and the United States.

The distribution of jurisdiction made by the act of March 3, 1891, c. 517, is to be observed in these cases; but the whole case is not open to adjudication, but the appeal is restricted to the constitutionality and validity of the legislation.

This legislation is not in contravention of the Constitution; on the contrary, the court holds it all to be constitutional.

BY the sixteenth section of the Indian Appropriation Act of March 3, 1893, c. 209, 27 Stat. 612, 645, the President was authorized to appoint, by and with the advice and consent of the Senate, three commissioners "to enter into negotiations with the Cherokee Nation, Choctaw Nation, Chickasaw Nation, the Muscogee (or Creek) Nation, the Seminole Nation, for the purpose of the extinguishment of the national or tribal title to any lands within that Territory now held by any and all of such nations or tribes, either by cession of the same or some part thereof to the United States, or by the allotment and division of the same in severalty among the Indians of such nations or tribes, respectively, as may be entitled to the same, or by such other method as may be agreed upon between the several nations and tribes aforesaid, or each of them, with the United States, with a view to such an adjustment, upon the basis of justice and equity, as may, with the consent of such nations or tribes of Indians, so far as may be necessary, be requisite and suitable to enable the ultimate creation of a State or States of the Union which shall embrace the lands within said Indian Territory."

The Commission was appointed and entered on the discharge of its duties, and under the sundry civil appropriation act of March 2, 1895, c. 189, 28 Stat. 939, two additional members

were appointed. It is commonly styled the "Dawes Commission."

The Senate on March 29, 1894, adopted the following resolution:

"*Resolved*, That the Committee on the Five Civilized Tribes of Indians, or any sub-committee thereof appointed by its chairman, is hereby instructed to inquire into the present condition of the Five Civilized Tribes of Indians, and of the white citizens dwelling among them, and the legislation required and appropriate to meet the needs and welfare of such Indians; and for that purpose to visit Indian Territory, to take testimony, have power to send for persons and papers, to administer oaths, and examine witnesses under oaths; and shall report the result of such inquiry, with recommendations for legislation; the actual expenses of such inquiry to be paid on approval of the chairman out of the contingent fund of the Senate."

The Committee visited the Indian Territory accordingly, and made a report May 7, 1894. (Sen. Rep. No. 377, 53d Cong. 2d Sess.) In this report it was stated: "The Indian Territory contains an area of 19,785,781 acres, and is occupied by the five civilized tribes of Indians, consisting of the Cherokees, Creeks, Choctaws, Chickasaws and Seminoles. Each tribe occupies a separate and distinct part, except that the Choctaws and Chickasaws, though occupying separately, have a common ownership of that part known as the Choctaw and Chickasaw territory, with rights and interests as recognized in their treaties as follows: The Choctaws, three fourths, and the Chickasaws, one fourth. The character of their title, the area of each tribe, together with the population and an epitome of the legislation concerning these Indians during the last sixty-five years, is shown by the report of the Committee on Indian Affairs, submitted to the Senate on the 26th day of July, 1892," (Sen. Rep. No. 1079, 52d Cong. 1st Sess.) and so much of that report as touched on those points was set forth.

The Committee then gave the population from the census of 1890 as follows: Indians, 50,055; colored Indians, colored

claimants to Indian citizenship, freedmen and colored, wholly or in part, 18,636 ; Chinese, 13 ; whites, 109,393 ; whites and colored on military reservation, 804 ; population of Quapaw Agency, 1281 ; or a total of 180,182 ; and said : " Since the taking of the census of 1890, there has been a large accession to the population of whites who make no claim to Indian citizenship, and who are residing in the Indian Territory with the approval of the Indian authorities. It is difficult to say what the number of this class is, but it cannot be less than 250,000, and it is estimated by many well-informed men as much larger than that number and as high as 300,000." After describing the towns and settlements peopled by whites, and the character of the Indian Territory, its climate, soil and natural wealth, the report continued :

" This section of country was set apart to the Indian with the avowed purpose of maintaining an Indian community beyond and away from the influence of white people. We stipulated that they should have unrestricted self-government and full jurisdiction over persons and property within their respective limits, and that we would protect them against intrusion of white people, and that we would not incorporate them in a political organization without their consent. Every treaty, from 1828 to and including the treaty of 1866, was based on this idea of exclusion of the Indians from the whites and non-participation by the whites in their political and industrial affairs. We made it possible for the Indians of that section of country to maintain their tribal relations and their Indian polity, laws and civilization if they wished so to do. And, if now, the isolation and exclusiveness sought to be given to them by our solemn treaties is destroyed, and they are overrun by a population of strangers five times in number to their own, it is not the fault of the Government of the United States, but comes from their own acts in admitting whites to citizenship under their laws and by inviting white people to come within their jurisdiction, to become traders, farmers and to follow professional pursuits.

" It must be assumed in considering this question that the Indians themselves have determined to abandon the policy of

exclusiveness, and to freely admit white people within the Indian Territory, for it cannot be possible that they can intend to demand the removal of the white people either by the Government of the United States or their own. They must have realized that when their policy of maintaining an Indian community isolated from the whites was abandoned for a time, it was abandoned forever."

The Committee next referred to the class of white people denominated by the Indians as intruders, in respect of whom there had been but little complaint in other sections of the Indian Territory than that of the Cherokee Nation; and went on to say:

"The Indians of the Indian Territory maintain an Indian government, have. legislative bodies and executive and judicial officers. All controversies between Indian citizens are disposed of in these local courts; controversies between white people and Indians cannot be settled in these courts, but must be taken into the court of the Territory established by the United States. This court was established in accordance with the provision of the treaties with the Choctaws, Chickasaws, Creeks and Seminoles, but no such provision seems to have been made in the treaty with the Cherokees. We think it must be admitted that there is just cause of complaint among the Indians as to the character of their own courts, and a good deal of dissatisfaction has been expressed as to the course of procedure and final determination of matters submitted to these courts. The determinations of these courts are final, and, so far, the Government of the United States has not directly interfered with their determinations. Perhaps we should except the recent case where the Secretary of the Interior thought it his duty to intervene to prevent the execution of a number of Choctaw citizens."

The report then recapitulated the legislation conferring certain jurisdiction over parts of the Indian Territory on the District Courts of the United States for the Western District of Arkansas, the Eastern District of Texas and the District of Kansas; the establishment of the United States court in the Indian Territory; the inclusion of a portion of

the Indian Territory within the boundaries of the Territory of Oklahoma, and the creation of a new Indian Territory, over parts of which the jurisdiction of the District Courts of Arkansas and Texas remained; and, for reasons assigned, recommended the appointment of two additional judges for the United States court in the Indian Territory, and of additional commissioners, and that the jurisdiction of the District Courts should be withdrawn.

The matter of schools was considered; and finally the question of title to the lands in the Indian Territory; and the Committee stated:

"As we have said, the title to these lands is held by the tribe in trust for the people. We have shown that this trust is not being properly executed, nor will it be if left to the Indians, and the question arises what is the duty of the Government of the United States with reference to this trust? While we have recognized these tribes as dependent nations, the Government has likewise recognized its guardianship over the Indians and its obligations to protect them in their property and personal rights.

"In the treaty with the Cherokees, made in 1846, we stipulated that they should pass laws for equal protection, and for the security of life, liberty and property. If the tribe fails to administer its trust properly by securing to all the people of the tribe equitable participation in the common property of the tribe, there appears to be no redress for the Indian so deprived of his rights, unless the Government does interfere to administer such trust.

"Is it possible because the Government has lodged the title in the tribe in trust that it is without power to compel the execution of the trust in accordance with the plain provisions of the treaty concerning such trust? Whatever power Congress possessed over the Indians as semi-dependent nations, or as persons within its jurisdiction, it still possesses; notwithstanding the several treaties may have stipulated that the Government would not exercise such power; and therefore Congress may deal with this question as if there had been no legislation save that which provided for the execution of the patent to the tribes.

"If the determination of the question whether the trust is or is not being properly executed is one for the courts and not for the legislative department of the Government, then Congress can provide by law how such questions shall be determined and how such trust shall be administered, if it is determined that it is not now being properly administered.

"It is apparent to all who are conversant with the present condition in the Indian Territory that their system of government cannot continue. It is not only non-American, but it is radically wrong, and a change is imperatively demanded in the interest of the Indian and whites alike, and such change cannot be much longer delayed. The situation grows worse and will continue to grow worse. There can be no modification of the system. It cannot be reformed. It must be abandoned and a better one substituted. That it will be difficult to do your Committee freely admit, but because it is a difficult task is no reason why Congress should not at the earliest possible moment address itself to this question."

On November 20, 1894, and November 18, 1895, the Dawes Commission made reports to Congress of the condition of affairs in the Indian Territory in respect of the manner in which the lands were held by the members of the tribes, and of the manner in which the citizenship of said tribes was dealt with, finding a deplorable state of affairs and the general prevalence of misrule.

In the report of November 18, 1895, the Commission, among other things, said: "It cannot be possible that in any portion of this country, government, no matter what its origin, can remain peaceably for any length of time in the hands of one fifth of the people subject to its laws. Sooner or later violence, if nothing else, will put an end to a state of affairs so abhorrent to the spirit of our institutions. But these governments are of our own creation, and rest for their very being on authority granted by the United States, who are therefore responsible for their character. It is bound by constitutional obligations to see to it that government everywhere within its jurisdiction rests on the consent of the governed. There is already painful evidence that in some parts of the Territory

this attempt of a fraction to dictate terms to the whole has already reached its limit, and, if left without interference, will break up in revolution."

And the Commission, after referring to tribal legislation in the Choctaw and Cherokee tribes bearing on citizenship, the manipulation of the rolls, and proceedings in Indian tribunals, stated : "The Commission is of the opinion that if citizenship is left, without control or supervision, to the absolute determination of the tribal authorities, with power to decitizenize at will, the greatest injustice will be perpetrated, and many good and law-abiding citizens reduced to beggary."

And further :

" The Commission is compelled to report that so long as power in these nations remains in the hands of those now exercising it, further effort to induce them by negotiation to voluntarily agree upon a change that will restore to the people the benefit of the tribal property, and that security and order in government enjoyed by the people of the United States, will be in vain.

" The Commission is therefore brought to the consideration of the question : What is the duty of the United States Government toward the people, Indian citizens and United States citizens, residing in this Territory under governments which it has itself erected within its own borders?

" No one conversant with the situation can doubt that it is impossible of continuance. It is of a nature that inevitably grows worse, and has in itself no power of regeneration. Its own history bears testimony to this truth. The condition is every day becoming more acute and serious. It has as little power as disposition for self-reform.

" Nothing has been made more clear to the Commission than that change, if it comes at all, must be wrought out by the authority of the United States. This people have been wisely given every opportunity and tendered every possible assistance to make this change for themselves, but they have persistently refused and insist upon being left to continue present conditions.

" There is no alternative left to the United States but to

assume the responsibility for future conditions in this Territory. It has created the forms of government which have brought about these results, and the continuance rests on its authority. Knowledge of how the power granted to govern themselves has been perverted takes away from the United States all justification for further delay. Insecurity of life and person and property increasing every day makes immediate action imperative.

"The pretence that the Government is debarred by treaty obligations from interference in the present condition of affairs in this Territory is without foundation. The present conditions are not 'treaty conditions.' There is not only no treaty obligation on the part of the United States to maintain, or even to permit, the present condition of affairs in the Indian Territory, but on the contrary the whole structure and tenor of the treaties forbid it. If our Government is obligated to maintain the treaties according to their original intent and purpose, it is obligated to blot out at once present conditions. It has been most clearly shown that a restoration of the treaty status is not only an impossibility, but if a possibility, would be disastrous to this people and against the wishes of all, people and governments alike. The cry, therefore, of those who have brought about this condition of affairs, to be let alone, not only finds no shelter in treaty obligations but is a plea for permission to further violate those provisions.

"The Commission is compelled by the evidence forced upon them during their examination into the administration of the so-called governments in this Territory to report that these governments in all their branches are wholly corrupt, irresponsible, and unworthy to be longer trusted with the care and control of the money and other property of Indian citizens, much less their lives, which they scarcely pretend to protect."

By the Indian Appropriation Act of June 10, 1896, c. 398, 29 Stat. 321, 339, the Commission was " directed to continue the exercise of the authority already conferred upon them by law, and endeavor to accomplish the objects heretofore prescribed to them, and report from time to time to Congress;" and it was further provided as follows:

" That said Commission is further authorized and directed to proceed at once to hear and determine the application of all persons who may apply to them for citizenship in any of said nations, and after such hearing they shall determine the right ,of such applicant to be so admitted and enrolled : *Provided,* *however,* That such application shall be made to such commissioners within three months after the passage of this act.

" The said Commission shall decide all such applications within ninety days after the same shall be made.

" That in determining all such applications said Commission shall respect all laws of the several nations or tribes, not inconsistent with the laws of the United States, and all treaties with either of said nations or tribes, and shall give due force and effect to the rolls, usages and customs of each of said nations or tribes : *And provided, further,* That the rolls of citizenship of the several tribes as now existing are hereby confirmed, and any person who shall claim to be entitled to be added to said rolls as a citizen of either of said tribes and whose right thereto has either been denied or not acted upon, or any citizen who may within three months from and after the passage of this act desire such citizenship, may apply to the legally constituted court or committee designated by the several tribes for such citizenship, and such court or committee shall determine such application within thirty days from the date thereof.

" In the performance of such duties said Commission shall have power and authority to administer oaths, to issue process for and compel the attendance of witnesses, and to send for persons and papers, and all depositions and affidavits and other evidence in any form whatsoever heretofore taken where the witnesses giving said testimony are dead or now residing beyond the limits of said Territory, and to use every fair and reasonable means within their reach for the purpose of determining the rights of persons claiming such citizenship, or to protect any of said nations from fraud or wrong, and the rolls so prepared by them shall be hereafter held and considered to be the true and correct rolls of persons entitled to the rights of citizenship in said several tribes : *Provided,* That if the

tribe, or any person, be aggrieved with the decision of the tribal authorities or the commission provided for in this act, it or he may appeal from such decision to the United States District Court: *Provided, however,* That the appeal shall be taken within sixty days, and the judgment of the court shall be final.

" That the said Commission, after the expiration of six months, shall cause a complete roll of citizenship of each of said nations to be made up from their records, and add thereto the names of citizens whose right may be conferred under this act, and said rolls shall be, and are hereby, made rolls of citizenship of said nations or tribes, subject, however, to the determination of the United States courts, as provided herein.

" The Commission is hereby required to file the lists of members as they finally approve them with the Commissioner of Indian Affairs to remain there for use as the final judgment of the duly constituted authorities. And said Commission shall also make a roll of freedmen entitled to citizenship in said tribes and shall include their names in the lists of members to be filed with the Commissioner of Indian Affairs."

By the act of March 1, 1889, c. 333, entitled "An act to establish a United States court in the Indian Territory, and for other purposes," 25 Stat. 783, a United States court was established, with a single judge, whose jurisdiction extended over the Indian Territory, and it was provided that two terms of said court should be held each year at Muscogee in said Territory on the first Mondays of April and September, and such special sessions as might be necessary for the despatch of business in said court at such times as the judge might deem expedient.

On May 2, 1890, an act was passed, c. 182, " to provide a temporary government for the Territory of Oklahoma, to enlarge the jurisdiction of the United States court in the Indian Territory, and for other purposes," 26 Stat. 81, 93, which enacted " that for the purpose of holding terms of said court, said Indian Territory is hereby divided into three divisions to be known as the first, second and third divisions;" the divisions were defined; the places in each division where court should be held were enumerated; and it was provided that

the "judge of said court shall hold at least two terms of said court in each year in each of the divisions aforesaid, at such regular times as such judge shall fix and determine."

March 1, 1895, an act was approved, c. 145, entitled "An act to provide for the appointment of additional judges of the United States court in the Indian Territory." 28 Stat. 693. The first section of this act declared: "That the Territory known as the Indian Territory, now within the jurisdiction of the United States court in said Territory, is hereby divided into three judicial districts, to be known as the Northern, Central and Southern Districts, and at least two terms of the United States court in the Indian Territory shall be held each year at each place of holding court in each district at such regular times as the judge for each district shall fix and determine. The Northern District shall consist of all the Creek country, all of the Seminole country, all of the Cherokee country, all of the country occupied by the Indian tribes in the Quapaw Indian Agency and the townsite of the Miami Townsite Company. . . . The Central District shall consist of all the Choctaw country. . . . The Southern District shall consist of all the Chickasaw country."

The act provided for two additional judges for the court, one of whom should be judge of the Northern District, and the other, judge of the Southern District, and that the judge then in office should be judge of the Central District. The judges were clothed with all the authority, both in term time and in vacation, as to all causes, both criminal and civil, that might be brought in said district, and the same superintending control over commissioners' courts therein, the same authority in the judicial districts to issue writs of *habeas corpus*, etc., as by law vested in the judge of the United States court in the Indian Territory or in the Circuit or District Courts of the United States. The judge of each district was authorized and empowered to hold court in any other district for the trial of any cause which the judge of such other district was disqualified from trying, and whenever on account of sickness or for any other reason the judge of any district was unable to perform the duties of his office, it was provided that either of the

other judges might act in his stead in term time or vacation. All laws theretofore enacted conferring jurisdiction upon the United States courts held in Arkansas, Kansas and Texas, outside of the limits of the Indian Territory as defined by law as to offences committed within the Territory, were repealed and their jurisdiction conferred after September 1, 1896, on the " United States courts in the Indian Territory."

By section eleven of this act it was provided :

" SEC. 11. That the judges of said court shall constitute a court of appeals, to be presided over by the judge oldest in commission as chief justice of said court; and said court shall have such jurisdiction and powers in said Indian Territory and such general superintending control over the courts thereof as is conferred upon the Supreme Court of Arkansas over the courts thereof by the laws of said State, as provided by chapter forty of Mansfield's Digest of the Laws of Arkansas, and the provisions of said chapter, so far as they relate to the jurisdiction and powers of said Supreme Court of Arkansas as to appeals and writs of error, and as to the trial and decision of causes, so far as they are applicable, shall be, and they are hereby, extended over and put in force in the Indian Territory; and appeals and writs of error from said court in said districts to said appellate court, in criminal cases, shall be prosecuted under the provisions of chapter forty-six of said Mansfield's Digest, by this act put in force in the Indian Territory. But no one of said judges shall sit in said appellate court in the determination of any cause in which an appeal is prosecuted from the decision of any court over which he presided.   In case of said presiding judge being absent, the judge next oldest in commission shall preside over said appellate court, and in such case two of said judges shall constitute a quorum.   In all cases where the court is equally divided in opinion, the judgment of the court below shall stand affirmed.

" Writs of error and appeals from the final decisions of said appellate court shall be allowed, and may be taken to the Circuit Court of Appeals for the Eighth Judicial Circuit in the same manner and under the same regulations as appeals are taken from the Circuit Courts of the United States.   Said

appellate court shall appoint its own clerk, who shall hold his office at the pleasure of said court, and who shall receive a salary of one thousand two hundred dollars per annum. The marshal of the district wherein such appellate court shall be held shall be marshal of such court. Said appellate court shall be held at South McAlester, in the Choctaw Nation, and it shall hold two terms in each year, at such times and for such periods as may be fixed by the court."

By the Indian Appropriation Act of June 7, 1897, c. 3, 30 Stat. 84, provision was made for the appointment of an additional judge for the United States court in the Indian Territory, who was to hold court at such places in the several judicial districts therein, and at such times, as the appellate court of the Territory might designate. This judge was to be a member of the appellate court and have all the authority, exercise all the powers, and perform the like duties as the other judges of the court, and it was "*Provided*, that no one of said judges shall sit in the hearing of any case in said appellate court which was decided by him."

By this act of June 7, 1897, it was also provided:

"That the Commission appointed to negotiate with the Five Civilized Tribes in the Indian Territory shall examine and report to Congress whether the Mississippi Choctaws under their treaties are not entitled to all the rights of Choctaw citizenship except an interest in the Choctaw annuities: *Provided further*, That on and after January first, eighteen hundred and ninety-eight, the United States courts in said Territory shall have original and exclusive jurisdiction and authority to try and determine all civil causes in law and equity thereafter instituted, and all criminal causes for the punishment of any offence committed after January first, eighteen hundred and ninety-eight, by any person in said Territory, and the United States commissioners in said Territory shall have and exercise the powers and jurisdiction already conferred upon them by existing laws of the United States as respects all persons and property in said Territory; and the laws of the United States and the State of Arkansas in force in the Territory shall apply to all persons therein, irrespective

·of race, said courts exercising jurisdiction thereof as now conferred upon them in the trial of like causes; and any citizen of any one of said tribes otherwise qualified who can speak and understand the English language may serve as a juror in any of said courts.

"That said Commission shall continue to exercise all authority heretofore conferred on it by law to negotiate with the Five Tribes, and any agreement made by it with any one of said tribes, when ratified, shall operate to suspend any provisions of this act if in conflict therewith as to said nation: *Provided*, That the words 'rolls of citizenship,' as used in the act of June tenth, eighteen hundred and ninety-six, making appropriations for current and contingent expenses of the Indian Department and fulfilling treaty stipulations with various Indian tribes for the fiscal year ending June thirtieth, eighteen hundred and ninety-seven, shall be construed to mean the last authenticated rolls of each tribe which have been approved by the council of the nation, and the descendants ·of those appearing on such rolls, and such additional names and their descendants as have been subsequently added, either by the council of such nation, the duly authorized courts thereof, or the Commission under the act of June tenth, eighteen hundred and ninety-six. And all other names appearing upon such rolls shall be open to investigation by such Commission for a period of six months after the passage of this act. And any name appearing on such rolls and not confirmed by the act of June tenth, eighteen hundred and ninety-six, as herein construed, may be stricken therefrom by such Commission where the party affected shall have ten days' previous notice that said Commission will investigate and determine the right of such party to remain upon such roll as a citizen of such nation: *Provided, also*, That any one whose name shall be stricken from the roll by such Commission shall have the right of appeal, as provided in the act of June tenth, eighteen hundred and ninety-six.

"That on and after January first, eighteen hundred and ninety-eight, all acts, ordinances and resolutions of the council of either of the aforesaid Five Tribes passed shall be certi-

fied immediately upon their passage to the President of the
United States and shall not take effect, if disapproved by him,
until thirty days after their passage: *Provided*, That this act
shall not apply to resolutions for adjournment, or any acts, or
resolutions, or ordinances in relation to negotiations with com-
missioners heretofore appointed to treat with said tribes."

From the annual report of the Commission of October 3,
1897, it appears that there had been presented, in accordance
with the provisions of the act of 1896, "some seven thousand
five hundred claims, representing nearly, if not quite, seventy-
five thousand individuals, each claim requiring a separate
adjudication upon the evidence upon which it rested;" and
that "about one thousand appeals have been taken from the
decisions of the Commission." And the Commission said:
"The condition to which these Five Tribes have been
brought by their wide departure in the administration of
the governments which the United States committed to their
own hands, and in the uses to which they have put the vast
tribal wealth with which they were intrusted for the com-
mon enjoyment of all their people, has been fully set forth
in former reports of the Commission as well as in the reports
of Congressional committees commissioned to make inquiry
on the ground. It would be but repetition to attempt again
a recital. Longer service among them and greater familiarity
with their condition have left nothing to modify either of
fact or conclusion in former reports, but on the contrary have
strengthened convictions that there can be no cure of the evils
engendered by the perversion of these great trusts but their
resumption by the Government which created them."

June 28, 1898, an act was approved, c. 517, entitled "An act
for the protection of the people of the Indian Territory, and
for other purposes." 30 Stat. 495. The second section read:

"Sec. 2. That when in the progress of any civil suit, either
in law or equity, pending in the United States court in any
district in said Territory, it shall appear to the court that
the property of any tribe is in any way affected by the issues
being heard, said court is hereby authorized and required to
make said tribe a party to said suit by service upon the chief

or governor of the tribe, and the suit shall thereafter be conducted and determined as if said tribe had been an original party to said action."

And the third and eleventh sections in part:

"SEC. 3. That said courts are hereby given jurisdiction in their respective districts to try cases against those who may claim to hold as members of a tribe and whose membership is denied by the tribe, but who continue to hold said lands and tenements notwithstanding the objection of the tribe; and if it be found upon trial that the same are held unlawfully against the tribe by those claiming to be members thereof, and the membership and right are disallowed by the Commission to the Five Tribes, or the United States court, and the judgment has become final, then said court shall cause the parties charged with unlawfully holding said possessions to be removed from the same and cause the lands and tenements to be restored to the person or persons or nation or tribe of Indians entitled to the possession of the same."

\*     \*     \*     \*     \*

"SEC. 11. That when the roll of citizenship of any one of said nations or tribes is fully completed as provided by law, and the survey of the lands of said nation or tribe is also completed, the Commission heretofore appointed under acts of Congress, and known as the 'Dawes Commission,' shall proceed to allot the exclusive use and occupancy of the surface of all the lands of said nation or tribe susceptible of allotment among the citizens thereof, as shown by said roll, giving to each, so far as possible, his fair and equal share thereof, considering the nature and fertility of the soil, location and value of same. . . . When such allotment of the lands of any tribe has been by them completed, said Commission shall make full report thereof to the Secretary of the Interior for his approval: *Provided,* That nothing herein contained shall in any way affect any vested legal rights which may have been heretofore granted by act of Congress, nor be so construed as to confer any additional rights upon any parties claiming under any such act of

Congress: *Provided further*, That whenever it shall appear that any member of a tribe is in possession of lands, his allotment may be made out of the lands in his possession, including his home if the holder so desires: *Provided further*, That if the person to whom an allotment shall have been made shall be declared, upon appeal as herein provided for, by any of the courts of the United States in or for the aforesaid Territory, to have been illegally accorded rights of citizenship, and for that or any other reason declared to be not entitled to any allotment, he shall be ousted and ejected from said lands."

Section 21 was as follows:

" That in making rolls of citizenship of the several tribes, as required by law, the Commission to the Five Civilized Tribes is authorized and directed to take the roll of Cherokee citizens of eighteen hundred and eighty (not including freedmen) as the only roll intended to be confirmed by this and preceding acts of Congress, and to enroll all persons now living whose names are found on said roll, and all descendants born since the date of said roll to persons whose names are found thereon; and all persons who have been enrolled by the tribal authorities who have heretofore made permanent settlement in the Cherokee Nation whose parents, by reason of their Cherokee blood, have been lawfully admitted to citizenship by the tribal authorities, and who were minors when their parents were so admitted; and they shall investigate the right of all other persons whose names are found on any other rolls and omit all such as may have been placed thereon by fraud or without authority of law, enrolling only such as may have lawful right thereto, and their descendants born since such rolls were made, with such intermarried white persons as may be entitled to citizenship under Cherokee laws.

" It shall make a roll of Cherokee freedmen in strict compliance with the decree of the Court of Claims rendered the third day of February, eighteen hundred and ninety-six.[1]

---

[1] Article IX of the treaty of July 19, 1866, with the Cherokee Nation, (14 Stat. 799, 801,) is as follows: "The Cherokee Nation having, voluntarily, in February, eighteen hundred and sixty-three, by an act of their national council, forever abolished slavery, hereby covenant and agree that

" Said commission is authorized and directed to make correct rolls of the citizens by blood of all the other tribes, eliminating from the tribal rolls such names as may have been placed thereon by fraud or without authority of law, enrolling such only as may have lawful right thereto, and their descendants born since such rolls were made, with such intermarried white persons as may be entitled to Choctaw and Chickasaw citizenship under the treaties and the laws of said tribes.

" Said commission shall have authority to determine the identity of Choctaw Indians claiming rights in the Choctaw lands under article fourteen of the treaty between the United States and the Choctaw Nation concluded September twenty-seventh, eighteen hundred and thirty, and to that end they may administer oaths, examine witnesses, and perform all other acts necessary thereto and make report to the Secretary of the Interior.

" The roll of Creek freedmen made by J. W. Dunn, under authority of the United States, prior to March fourteenth,

never hereafter shall either slavery or involuntary servitude exist in their nation otherwise than in the punishment of crime, whereof the party shall have been duly convicted, in accordance with laws applicable to all the members of said tribe alike. They further agree that all freedmen who have been liberated by voluntary act of their former owners or by law, as well as all free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months, and their descendants, shall have all the rights of native Cherokees : *Provided*, That owners of slaves so emancipated in the Cherokee Nation shall never receive any compensation or pay for the slaves so emancipated."

Referring to that article, the Court of Claims, February 18, 1896, transmitted a communication to the Commissioner of Indian Affairs, stating: " The court is of the opinion that the clauses in that article in these words, ' and are now residents therein, or who may return within six months, and their descendants,' were intended, for the protection of the Cherokee Nation, as a limitation upon the number of persons who might avail themselves of the provisions of the treaty ; and, consequently, that they refer to both the freedmen and the free colored persons previously named in the article. That is to say, freedmen, and the descendants of freedmen, who did not return within six months, are excluded from the benefits of the treaty and of the decree. The court is also of the opinion that this period of six months extends from the date of the promulgation of the treaty, August 11, 1866, and consequently did not expire until February 11, 1867." 31 Ct. Cl. 148.

eighteen hundred and sixty-seven, is hereby confirmed, and said Commission is directed to enroll all persons now living whose names are found on said rolls, and all descendants born since the date of said roll to persons whose names are found thereon, with such other persons of African descent as may have been rightfully admitted by the lawful authorities of the Creek Nation.

"It shall make a correct roll of all Choctaw freedmen entitled to citizenship under the treaties and laws of the Choctaw Nation, and all their descendants born to them since the date of the treaty.

"It shall make a correct roll of Chickasaw freedmen entitled to any rights or benefits under the treaty made in eighteen hundred and sixty-six between the United States and the Choctaw and Chickasaw tribes and their descendants born to them since the date of said treaty and forty acres of land, including their present residences and improvements, shall be allotted to each, to be selected, held and used by them until their rights under said treaty shall be determined in such manner as shall be hereafter provided by Congress.

"The several tribes may, by agreement, determine the right of persons who for any reason may claim citizenship in two or more tribes, and to allotment of lands and distribution of moneys belonging to each tribe ; but if no such agreement be made, then such claimant shall be entitled to such rights in one tribe only, and may elect in which tribe he will take such right; but if he fail or refuse to make such selection in due time, he shall be enrolled in the tribe with whom he has resided, and there be given such allotment and distributions, and not elsewhere.

"No person shall be enrolled who has not heretofore removed to and in good faith settled in the nation in which he claims citizenship: *Provided, however*, That nothing contained in this act shall be so construed as to militate against any rights or privileges which the Mississippi Choctaws may have under the laws of or the treaties with the United States.

"Said Commission shall make such rolls descriptive of the persons thereon, so that they may be thereby identified, and

it is authorized to take a census of each of said tribes, or to adopt any other means by them deemed necessary to enable them to make such rolls. They shall have access to all rolls and records of the several tribes, and the United States court in Indian Territory shall have jurisdiction to compel the officers of the tribal governments and custodians of such rolls and records to deliver same to said Commission, and on their refusal or failure to do so to punish them as for contempt; as also to require all citizens of said tribes, and persons who should be so enrolled, to appear before said Commission for enrolment, at such times and places as may be fixed by said Commission, and to enforce obedience of all others concerned, so far as the same may be necessary, to enable said Commission to make rolls as herein required, and to punish any one who may in any manner or by any means obstruct said work.

"The rolls so made, when approved by the Secretary of the Interior, shall be final, and the persons whose names are found thereon, with their descendants thereafter born to them, with such persons as may intermarry according to tribal laws, shall alone constitute the several tribes which they represent.

"The members of said Commission shall, in performing all duties required of them by law, have authority to administer oaths, examine witnesses, and send for persons and papers; and any person who shall wilfully and knowingly make any false affidavit or oath to any material fact or matter before any member of said commission, or before any other officer authorized to administer oaths, to any affidavit or other paper to be filed or oath taken before said commission, shall be deemed guilty of perjury, and on conviction thereof shall be punished as for such offence."

"SEC. 26. That on and after the passage of this act the laws of the various tribes or nations of Indians shall not be enforced at law or in equity by the courts of the United States in the Indian Territory."

"SEC. 28. That on the first day of July, eighteen hundred and ninety-eight, all tribal courts in Indian Territory shall be abolished, and no officer of said courts shall thereafter have any authority whatever to do or perform any act theretofore

authorized by any law in connection with said courts, or to receive any pay for same; and all civil and criminal causes then pending in any such court shall be transferred to the United States court in said Territory by filing with the clerk of the court the original papers in the suit: *Provided*, That this section shall not be in force as to the Chickasaw, Choctaw and Creek tribes or nations until the first day of October, eighteen hundred and ninety-eight."

Section 29 ratified the agreement made by the Commission with commissions representing the Choctaw and Chickasaw tribes, April 23, 1897, as amended by the act, and provided for its going into effect if ratified before December 1, 1898, by a majority of the whole number of votes cast by the members of said tribes at an election held for that purpose, "*Provided*, that no person whose right to citizenship in either of said tribes or nations is now contested in original or appellate proceedings before any United States court shall be permitted to vote at said election;" "and if said agreement as amended be so ratified, the provisions of this act shall then only apply to said tribes where the same do not conflict with the provisions of said agreement."

Then followed the agreement referred to, containing provisions as to allotments, railroads, town sites, mines, jurisdiction of courts and tribal legislation, and stating: "It is further agreed, in view of the modification of legislative authority and judicial jurisdiction herein provided, and the necessity of the continuance of the tribal governments so modified, in order to carry out the requirements of this agreement, that the same shall continue for the period of eight years from the fourth day of March, eighteen hundred and ninety-eight. This stipulation is made in the belief that the tribal governments so modified will prove so satisfactory that there will be no need or desire for further change till the lands now occupied by the Five Civilized Tribes shall, in the opinion of Congress, be prepared for admission as a State in the Union. But this provision shall not be construed to be in any respect an abdication by Congress of power at any time to make needful rules and regulations respecting said tribes." The agreement was

ratified by the two nations in August, 1898.   Rep. Com. Ind.
Affairs, 1898, p. 77.

Section thirty made similar provision in respect of an agree-
ment with the Creek Nation, which is set forth.

The Indian Appropriation Act of July 1, 1898, c. 545, 30 Stat.
571, 591, continued the authority theretofore conferred on the
Commission by law, and contained this provision:

"Appeals shall be allowed from the United States courts in
the Indian Territory direct to the Supreme Court of the United
States to either party, in all citizenship cases, and in all cases
between either of the Five Civilized Tribes and the United
States, involving the constitutionality or validity of any legis-
lation affecting citizenship, or the allotment of lands, in the
Indian Territory, under the rules and regulations governing
appeals to said court in other cases: *Provided*, That appeals
in cases decided prior to this act must be perfected in one hun-
dred and twenty days from its passage; and in cases decided
subsequent thereto, within sixty days from final judgment;
but in no such case shall the work of the Commission to the
Five Civilized Tribes be enjoined or suspended by any proceed-
ing in, or order of, any court, or of any judge, until after final
judgment in the Supreme Court of the United States.   In cases
of appeals, as aforesaid, it shall be the duty of the Supreme
Court to advance such cases on the docket and dispose of the
same as early as possible."

Thereupon numerous appeals were prosecuted to this court,
of which one hundred and sixty-six were submitted on printed
briefs, with oral argument in many of them.   Four of these
appeals are set out in the title, numbered 423, 453, 461, 496,
and the remaining one hundred and sixty-two are enumerated
in the margin.[1]

---

[1] No. 436, Cobb et al. *v.* Cherokee Nation; No. 438, Coldwell et al. *v.*
Choctaw Nation; No. 445, Castoe et al. *v.* Cherokee Nation; No. 446, Ander-
son et al. *v.* Cherokee Nation; No. 447, Clark et al. *v.* Choctaw Nation; No.
449, Choctaw Nation *v.* Mickle et al.; No. 450, Same *v.* Skaggs; No. 451,
Same *v.* Godard et al.; No. 452, Same *v.* Grady; No. 454, Morgan et al. *v.*
Creek Nation; No. 456, Bridges et al. *v.* Creek Nation; No. 457, Cherokee
Nation *v.* Parker et al.; No. 458, Same *v.* Gilliam et al.; No. 459, Bell et al.
*v.* Cherokee Nation; No. 460, Truitt et al. *v.* Cherokee Nation; No. 464, Jor-

The proceedings in these four appeals are sufficiently stated as follows:

No. 423.— STEPHENS ET AL. v. THE CHEROKEE NATION.

William Stephens; Mattie J. Ayres, his daughter; Stephen G. Ayres, Jacob S. Ayres and Mattie Ayres, his grandchil-

dan et al. v. Cherokee Nation; No. 465, Ward et al. v. Cherokee Nation; No. 466, Wassom et al. v. Muskogee or Creek Nation; No. 469, Chickasaw Nation v. Roff et al.; No. 470, Same v. Troop; No. 471, Same v. Love; No. 472, Same v. Hill et al.; No. 473, Same v. Thompson et al.; No. 474, Same v. Love; No. 475, Same v. Poe et al.; No. 476, Same v. McDuffie et al.; No. 477, Same v. McKinney et al.; No. 478, Same v. Bounds et al.; No. 479, Same v. King et al.; No. 480, Same v. Washington et al. ; No. 481, Same v. Fitzhugh et al.; No. 482, Same v. Jones et al.; No. 483, Same v. Sparks et al.; No. 484, Same v. Hill et al.; No. 485, Same v. Arnold et al.; No. 486, Same v. Brown et al.; No. 487, Same v. Joines et al.; No. 488, Same v. Halford et al.; No. 489, Same v. Poyner et al.; No. 490, Same v. Albright et al.; No. 491, Same v. Doak et al.; No. 492, Same v. Passmore; No. 493, Same v. Laflin et al.; No. 494, Same v. Law et al.; No. 495, Same v. Saey; No. 497, Same v. Woody et al.; No. 498, Same v. Cornish et al.; No. 499, Same v. McSwain; No. 500, Same v. Standifer; No. 501, Same v. Bradley et al.; No. 502, Same v. Alexander et al.; No. 503, Same v. Sparks et al.; No. 504, Same v. Story et al.; No. 505, Same v. Archard et al.; No. 506, Same v. Keys; No. 507, Same v. McCoy; No. 508, Same v. Vaughan et al.; No. 509, Same v. Dorchester et al.; No. 510, Same v. Duncan; No. 511, Same v. Phillips et al.; No. 512, Same v. Lancaster; No. 513, Same v. Goldsby et al.; No. 514, Same v. East et al.; No. 515, Same v. Bradshaw et al.; No. 516, Same v. Graham et al.; No. 517, Same v. Burch et al.; No. 518, Same v. Palmer et al.; No. 519, Same v. Watkins et al.; No. 520, Same v. Holder et al.; No. 521, Same v. Jones et al.; No. 522, Same v. Worthy et al.; No. 523, Same v. Sartin et al.; No. 524, Same v. Woolsey et al.; No. 525, Same v. Arnold et al.; No. 526, Same v. Paul et al.; No. 527, Same v. Peery et al.; No. 528, Same v. Stinnet; No. 529, Same v. Stinnett et al.; No. 530, Same v. Duncan; No. 531, Same v. Lea et al.; No. 532, Same v. Hamilton; No. 533, Same v. Pitman; No. 534, Same v. Carson et al.; No. 535, Same v. Shanks et al.; No. 536, Same v. Paul; No. 537, Clark et al. v. Creek or Muskogee Nation; No. 538, Tulk et al. v. Same; No. 539, Hubbard et al. v. Cherokee Nation; No. 540, McAnnally et al. v. Same; No. 541, Brashear et al. v. Same; No. 542, Condry et al. v. Same; No. 543, Dial et al. v. Same; No. 544, Munson et al. v. Same; No. 545, Hubbard et al. v. Same; No. 546, Trotter et al. v. Same; No. 547, Hill et al. v. Same; No. 548, Russell et al. v. Same; No. 549, Baird et al. v. Same; No. 550, Binns et al. v. Same; No. 551, Smith et al. v. Same; No. 552, Henley et al. v. Same; No. 553, Same v. Same; No. 554, McKee et al. v. Same; No. 555, Singleton et al. v. Same; No. 556, Brown et al. v. Same; No. 557,

dren, applied to the Dawes Commission for admission to citizenship in the Cherokee Nation, August 9, 1896 ; the nation answered denying the jurisdiction of the Commission, and on the merits ; and the application was rejected, whereupon applicants appealed to the United States court in the Indian Territory, Northern District, where the cause was referred to a special master, who reported on the evidence that the applicants were Cherokee Indians by blood. The court, Springer, J., accepted the findings of the master that William Stephens was one fourth Indian and three fourths white ; that he was born in the State of Ohio ; that his father was a white man and a citizen of the United States ; that his mother's name was Sarah and that she was a daughter of William Ellington Shoe-Boots, and that her father was known as Captain Shoe-Boots in the old Cherokee Nation ; that his mother was born in the State of Kentucky, and that she moved afterwards to the State of Ohio, where she was married to Robert Stephens,

---

Flippin et al. *v.* Same; No. 558, Gambill et al. *v.* Same; No. 559, Brewer et al. *v.* Same; No. 560, Abercrombie et al. *v.* Same; No. 561, Watts et al. *v.* Same; No. 562, Hackett et al. *v.* Same; No. 563, Pace et al. *v.* Same; No. 564, Teague et al. *v.* Same; No. 565, Earp et al. *v.* Same; No. 566, Mayberry et al. *v.* Same; No. 567, Bailes *v.* Same; No. 568, Lloyd *v.* Same; No. 569, Rutherford et al. *v.* Same; No. 570, Braught et al. *v.* Same; No. 571, Black et al. *v.* Same; No. 572, Archer et al. *v.* Same; No. 573, Hopper et al. *v.* Same; No. 574, Bayes et al. *v.* Same; No. 575, Rowell et al. *v.* Same; No. 576, Armstrong et al. *v.* Same; No. 577, Goin et al. *v.* Same; No. 578, Bennight et al. *v.* Choctaw Nation; No. 579, Wade et al. *v.* Cherokee Nation; No. 582, Choctaw Nation *v.* Jones et al.; No. 583, Same *v.* Goodall et al.; No. 584, Same *v.* Bottoms et al.; No. 585, Same *v.* Brooks et al.; No. 586, Same *v.* Blake et al.; No. 587, Same *v.* Randolph et al.; No. 588, Same *v.* Goins et al.; No. 589, Same *v.* Dutton et al.; No. 590, Same *v.* Thomas; No. 591, Same *v.* Jones et al.; No. 592, Meredith et al. *v.* Cherokee Nation; No. 593, Poindexter et al. *v.* Same; No. 598, Steen et al. *v.* Same; No. 599, Couch et al. *v.* Same; No. 600, Pressley et al. *v.* Same; No. 601, Elliott et al. *v.* Same; No. 608, Walker et al. *v.* Same; No. 609, Harrison et al. *v.* Same; No. 612, Watts et al. *v.* Same; No. 613, Hazlewood et al. *v.* Same; No. 614, Frakes et al. *v.* Same; No. 615, Harper et al. *v.* Same; No. 616, Armstrong et al. *v.* Same; No. 617, Rogers et al. *v.* Same; No. 618, Isbell et al. *v.* Same; No. 619, Wiltenberger et al. *v.* Same; No. 637, Baker *v.* Creek Nation; No. 643, Caie *v.* Choctaw Nation; No. 644, Cundiff et al. *v.* Same; No. 645, Slayton et al. *v.* Same; No. 646, Willis et al. *v.* Same; No. 647, Coppedge *v.* Same; No. 648, Nabors et al. *v.* Same; No. 651, Phillips et al. *v.* Same.

the father of William ; that William Stephens came to the Cherokee Nation, Indian Territory, in 1873, and has resided in the Cherokee Nation ever since ; that soon after he came to the Cherokee Nation he made application for his mother and himself to be readmitted as citizens of that nation ; that the Commission who heard the case was convinced of the genuineness of his claim to Cherokee blood, and so reported to the chief, but rejected his application on a technical ground ; that the chief, in a message to the council, stated that he was convinced of the honesty and genuineness of the claim, and wished the council to pass an act recognizing Stephens as a full citizen ; but this was never done. The court, referring to the master's report, said :

" It is further stated that he has improved considerable property in the nation, and has continuously lived there as a Cherokee citizen, and at one time was permitted to vote in a Cherokee election. It appears from the evidence in the case that this applicant comes within the following provision of the Cherokee constitution : ' Whenever any citizen shall remove with his effects out of the limits of this nation and becomes a citizen of any other government, all his rights and privileges as a citizen of this nation shall cease : Provided, nevertheless, That the national council shall have power to readmit by law to all the rights of citizenship any such person or persons who may at any time desire to return to the nation on memorializing the national council for such readmission.' There was a provision precisely similar to this in the constitution of the old Cherokee Nation as it existed prior to the removal of the tribe west of the Mississippi River. The provision just quoted is from the constitution of the Cherokee Nation as now constituted.

" The mother of the principal claimant, as heretofore stated, was born in the State of Kentucky, and from that State she moved to the State of Ohio, where she married the father of the principal claimant in this case. Her status was then fixed as that of one who had taken up a residence in the States. She had ceased to be a citizen of the Cherokee Nation, and she cannot be readmitted to citizenship in the nation except by

complying with the constitution and laws of the nation as declared by the Supreme Court in the case of The Eastern Band of Cherokee Indians against The Cherokee Nation and The United States.

" The master states the claimant was rejected by the commission of the Cherokee Nation upon a technical ground. The ground upon which the decision was based was that the names of the claimants did not appear upon any of the authenticated rolls of the present Cherokee Nation or of the old Cherokee Nation. The commission which passed upon his application was created under the act of the council of December 8, 1886.

" Robert Stephens, the father of the principal claimant in this case, was a citizen of the United States and a resident of the State of Ohio, and the mother of the claimant William Stephens had abandoned the Cherokee Nation and ceased to be a citizen thereof. Therefore the principal claimant at the time of his birth was a citizen of the United States, taking the status of his father. I doubt whether he could become a citizen of the Cherokee Nation without the affirmative action of the Cherokee council. The evidence fails to disclose that he has ever applied to any of the commissions that had jurisdiction to admit him as a citizen of the Cherokee Nation. The commission to which he did apply for enrolment as a citizen of the Cherokee Nation having held that his name did not appear upon any of the Cherokee rolls of citizenship, his application was rejected. He never having been admitted to citizenship as required by the constitution and laws of the Cherokee Nation, the judgment of the United States commission rejecting this case is affirmed, and the application of the claimants to be enrolled as citizens of the Cherokee Nation is denied."

Judgment affirming the decision of the Dawes Commission refusing applicants' enrolment and admission as citizens of the Cherokee Nation was entered December 16, 1897, whereupon a motion for rehearing was filed, which was finally overruled June 23, 1898, and judgment again entered that applicants " be not admitted and enrolled as citizens of the Cherokee Nation, Indian Territory." From these decrees applicants prayed

an appeal to this court August 29, 1898, which was allowed and perfected September 2, 1898, and the record filed here October 3, 1898.

No. 453. — THE CHOCTAW NATION v. F. R. ROBINSON.

September 7, 1896, F. R. Robinson applied to the Dawes Commission to be enrolled as an intermarried citizen. His petition set forth that he was a white man; that he married a woman of Choctaw and Chickasaw blood, September 21, 1873, by which marriage he had five children; that she died, and he married a white woman August 10, 1884, with whom he was still living. The Choctaw Nation answered, objecting that the Dawes Commission had no jurisdiction because the act of Congress creating it was unconstitutional and void; that Robinson had not applied for citizenship to the tribunal of the Choctaw Nation constituted to try questions of citizenship; and that he ought not to be enrolled "because he has not shown by his evidence that he has not forfeited his rights as such citizen by abandonment or remarriage." The Dawes Commission granted the application, and thereupon the Choctaw Nation appealed to the United States court in the Indian Territory, Central District. The cause was referred to a master, who made a report, and thereafter, June 29, 1897, the court, Clayton, J., found that Robinson was "a member and citizen of the Choctaw Nation by intermarriage, having heretofore been legally and in compliance with the laws of the Choctaw Nation married to a Choctaw woman by blood, and that said F. R. Robinson was by the duly constituted authorities of the Choctaw Nation placed upon the last roll of the members and citizens of the Choctaw Nation prepared by the said Choctaw authorities, and that his name is now upon the last completed rolls of the members and citizens of the said Choctaw Nation," and thereupon decreed that Robinson was "a member and citizen, by intermarriage with the Choctaw Nation, and entitled to all the rights, privileges, immunities and benefits in said nation as such intermarried citizen and said member;" and directed a certified copy of the judgment to be transmitted to the Commission. From this decree the

Choctaw Nation prayed an appeal September 21, 1898, which was on that day allowed and perfected.

No. 461. — JENNIE JOHNSON ET AL. *v.* THE CREEK NATION.

This was a petition of Jennie Johnson and others to the Dawes Commission for admission to citizenship and membership in the Creek Nation. It seems to have been presented August 10, 1896, on behalf of one hundred and nineteen applicants, to have been granted as to sixty-two, and to have been denied as to fifty-seven, by whom an appeal was taken to the United States court in the Indian Territory, Northern District. The cause was referred to a special master, and on June 16, 1898, the court, Springer, J., rendered an opinion, in which, after considering various laws of the Muskogee or Creek Nation bearing on the subject, certain decisions of tribal courts, the action of a certain "committee of eighteen on census rolls of 1895," and of the council thereon adopting the report of that committee, in respect of applicants, the court concluded that appellants were not entitled to be enrolled as citizens of the Creek Nation, and entered judgment accordingly, whereupon an appeal was prayed from said decree and allowed and perfected September 27, 1898.

No. 496. — THE CHICKASAW NATION *v.* RICHARD C. WIGGS ET AL.

Richard C. Wiggs filed an application before the Dawes Commission to be admitted to citizenship in the Chickasaw Nation, asserting, among other things, that he was a white man and prior to October 13, 1875, a citizen of the United States, on which day he lawfully married Georgia M. Allen, a native Chickasaw Indian and member of the Chickasaw tribe; and also an application on behalf of his wife, Josie Wiggs, at the time of their marriage, which was in accordance with the Chickasaw laws under such circumstances, a white woman and citizen of the United States, and their daughter Edna Wiggs, August 15, 1896. The Chickasaw Nation, September 1, 1896, filed with the Commission its answer to these applications, which, after denying the jurisdiction of the Commission, traversed the allegations of the applications.

November 15, 1896, the Dawes Commission admitted Richard
C. Wiggs to citizenship in the Chickasaw Nation, but denied
the application as to Mrs. Wiggs and their daughter.   There-
after an appeal was taken on behalf of the wife and daughter
to the United States court in the Indian Territory, Southern
District, and a cross appeal by the Chickasaw Nation from
the decision of the Commission admitting Wiggs to citizen-
ship.   The court referred the cause to a master in chancery,
who made a report in favor of Wiggs, but against his wife
and daughter.   The court, Townsend, J., found " that all of
the applicants are entitled to be enrolled as Chickasaw Ind-
ians, it appearing to the court that the said Richard C.
Wiggs, being a white man and citizen of the United States,
was married in the year 1875 to Georgia M. Allen, who was
a native Chickasaw Indian by blood.   Said marriage was
solemnized according to the laws of the Chickasaw Nation;
that in the year 1876 the said wife of the said Richard C.
Wiggs died ; that from and after said marriage the said Rich-
ard C. Wiggs continued to reside in the Chickasaw Nation and
to claim the rights of citizenship in said nation, and as such
he served in the Chickasaw legislature, and was also sheriff
of Pickens County, in said nation ; that in the year 1886 the
said Richard C. Wiggs was lawfully married, according to
the laws of the Chickasaw Nation, to Miss Josie Lawson, and
that ever since said marriage the said Wiggs and his present
wife have resided in the Chickasaw Nation and claimed the
rights of citizenship therein, and that there has been born
unto them a daughter, Mary Edna Wiggs;" and thereupon
entered a decree, December 22, 1897, admitting Richard C.
Wiggs, his wife and their daughter, " to citizenship in the
Chickasaw Nation and to enrolment as members of the tribe
of Chickasaw Indians, with all the rights and privileges apper-
taining to such relation ; and it is further ordered that this
decree be certified to the Dawes Commission for their ob-
servance."

From this decree an appeal was allowed and perfected July
11, 1898.

*Cherokee Nation cases.    (Some argued, some submitted.)*

*Mr. S. M. Porter* for appellants argued Nos. 445, 446 February 24.    *Mr. Heber J. May* for appellants argued other Cherokee cases February 27.    *Mr. A. H. Garland, Mr. R. C. Garland* and *Mr. M. M. Edmiston* were on Mr. May's brief.

*Mr. William T. Hutchins* and *Mr. Wilkinson Call* argued for the Cherokee Nation February 27.

*Mr. Joseph M. Hill* and *Mr. James Brizzolara* filed a brief for appellants in No. 436.

*Mr. William M. Cravens* filed a brief for appellants in No. 459.

*Chickasaw Nation cases.  (All submitted.)*

*Mr. Halbert E. Paine* and *Mr. Holmes Conrad* for appellants, submitted February 23.    *Mr. Joseph G. Ralls* also for appellants.

*Mr. C. C. Potter* submitted for appellees February 23.   The following submissions were made subsequently. *Mr. Silas Hare* and *Mr. Charles A. Keigwin* for appellants in No. 527. *Mr. Thomas Norman* and *Mr. William I. Cruce* for appellees in No. 472.    *Mr. C. C. Potter* for appellee in Nos. 473 and 477.    *Mr. Robert H. West* and *Mr. James L. Norris* for appellee in No. 474.    *Mr. Henry M. Furman, Mr. Calvin L. Herbert, Mr. William I. Cruce, Mr. Andrew C. Cruce* and *Mr. James C. Thompson* for appellees in Nos. 469 and others. *Mr. J. W. Johnson* and *Mr. Dorset Carter* for appellees in No. 513.    *Mr. W. A. Ledbetter* and *Mr. S. T. Bledroe* for appellees in No. 520.

*Choctaw Nation cases.  (Some argued, some submitted.)*

*Mr. J. M. Wilson* for the Nation argued March 6, 7.   *Mr. C. L. Herbert* for appellees in Nos. 586, 588 and 589, argued March 7.   *Mr. Yancey Lewis, Mr. W. W. Dudley* and *Mr. L. T. Michener* for claimants in No. 438 ; *Mr. Yancey Lewis* for claimants in Nos. 447, 452, and 454 ; *Mr. William Ritchie*

for claimants in No. 453; *Mr. M. M. Lindly, Mr. Jacob C. Hodges, Mr. P. D. Brewer* and *Mr. J. A. Hale* for claimants in No. 578; *Mr. Yancey Lewis* and *Mr. J. G. Ralls* for claimants in No. 644; *Mr. Walter A. Logan* and *Mr. William T. Hutchins* for claimants in No. 648; and *Mr. W. W. Dudley, Mr. L. T. Michener* and *Mr. Eugene Easton* for claimants in No. 450; and *Mr. Joseph G. Ralls* for appellants in Nos. 648, 647, 646, 645, 643 and 651 submitted on their respective briefs.

*Creek or Muskogee Nation cases. (All submitted March 7.)*

*Mr. William M. Cravens* for appellants in Nos. 454, 461.

*Mr. Benjamin T. Du Val* for the Muskogee Nation in Nos. 461 and 454.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

These appeals are from decrees of the United States court in the Indian Territory, sitting in first instance, rendered in cases pending therein involving the right of various individuals to citizenship in some one of the four tribes named; most of them came to that court by appeal from the action of the so-called Dawes Commission, though some were from decisions of tribal authorities; many questions are common to them all; and it will be assumed that in all of them the decrees were rendered and the court had finally adjourned before the passage of the act of July 1, 1898, providing for appeals to this court.

The act of June 10, 1896, provided "that if the tribe, or any person, be aggrieved with the decision of the tribal authorities or the Commission provided for in this act, it or he may appeal from such decision to the United States District Court: *Provided, however*, That the appeal shall be taken within sixty days, and the judgment of the court shall be final."

It must be admitted that the words "United States District Court" were not accurately used, as the United States Court in the Indian Territory was not a District or Circuit Court of

the United States, *In re Mills*, 135 U. S. 263, 268, and no such court had, at the date of the act, jurisdiction therein. But as, manifestly, the appeal was to be taken to a United States court having jurisdiction in the Indian Territory, and in view of the other terms of the act bearing on the immediate subject-matter, to say nothing of subsequent legislation, it is clear that the United States court in the Indian Territory was the court referred to. This conclusion, however, may fairly be said to involve the rejection of the word " District " as a descriptive term, and reading the provision as granting an appeal to the United States court in the Indian Territory, the question arises whether the judgments made final by the statute are the judgments of that court in the several districts delineated by the act of March 1, 1895, or of the appellate court therein provided for, which may be referred to later on, since it is objected in the outset that no appeal from the decisions of the Dawes Commission or of the tribal authorities could be granted to any United States court; and, further-more, that, at all events, it was not competent for Congress to provide for an appeal from the decrees of the United States court in the Indian Territory after such decrees had been rendered and the term of court had expired, and especially as they were made final by the statute.

As to the first of these objections, conceding the constitutionality of the legislation otherwise, we need spend no time upon it, as it is firmly established that Congress may provide for the review of the action of commissions and boards created by it, exercising only *quasi* judicial powers, by the transfer of their proceedings and decisions, denominated appeals for want of a better term, to judicial tribunals for examination and determination *de novo ;* and, as will be presently seen, could certainly do so in respect of the action of tribal authorities.

The other objection, though appearing at first blush to be more serious, is also untenable.

The contention is that the act of July 1, 1898, in extending the remedy by appeal to this court was invalid because retrospective, an invasion of the judicial domain, and destructive of vested rights. By its terms the act was to operate

retrospectively, and as to that it may be observed that while the general rule is that statutes should be so construed as to give them only prospective operation, yet where the language employed expresses a contrary intention in unequivocal terms, the mere fact that the legislation is retroactive does not necessarily render it void.

And while it is undoubtedly true that legislatures cannot set aside the judgments of courts, compel them to grant new trials, order the discharge of offenders, or direct what steps shall be taken in the progress of a judicial inquiry, the grant of a new remedy by way of review has been often sustained under particular circumstances. *Calder* v. *Bull*, 3 Dallas, 386; *Sampeyreac* v. *United States*, 7 Pet. 222; *Freeborn* v. *Smith*, 2 Wall. 160; *Garrison* v. *New York*, 21 Wall. 196; *Freeland* v. *Williams*, 131 U. S. 405; *Essex Public Road Board* v. *Skinkle*, 140 U. S. 334.

The United States court in the Indian Territory is a legislative court and was authorized to exercise jurisdiction in these citizenship cases as a part of the machinery devised by Congress in the discharge of its duties in respect of these Indian tribes, and assuming that Congress possesses plenary power of legislation in regard to them, subject only to the Constitution of the United States, it follows that the validity of remedial legislation of this sort cannot be questioned unless in violation of some prohibition of that instrument.

In its enactment Congress has not attempted to interfere in any way with the judicial department of the Government, nor can the act be properly regarded as destroying any vested right, since the right asserted to be vested is only the exemption of these judgments from review, and the mere expectation of a share in the public lands and moneys of these tribes, if hereafter distributed, if the applicants are admitted to citizenship, cannot be held to amount to such an absolute right of property that the original cause of action, which is citizenship or not, is placed by the judgment of a lower court beyond the power of reëxamination by a higher court though subsequently authorized by general law to exercise jurisdiction.

This brings us to consider the nature and extent of the

appeal provided for. We repeat the language of the act of July 1, 1898, as follows :

"Appeals shall be allowed from the United States courts in the Indian Territory direct to the Supreme Court of the United States to either party, in all citizenship cases, and in all cases between either of the Five Civilized Tribes and the United States involving the constitutionality or validity of any legislation affecting citizenship, or the allotment of lands in the Indian Territory, under the rules and regulations governing appeals to said court in other cases : *Provided,* That appeals in cases decided prior to this act must be perfected in one hundred and twenty days from its passage ; and in cases decided subsequent thereto, within sixty days from final judgment ; but in no such case shall the work of the Commission to the Five Civilized Tribes be enjoined or suspended by any proceeding in, or order of, any court, or of any judge, until after final judgment in the Supreme Court of the United States. In cases of appeals, as aforesaid, it shall be the duty of the Supreme Court to advance such cases on the docket and dispose of the same as early as possible."

This provision is not altogether clear, and we therefore inquire what is its true construction ? Was it the intention of Congress to impose on this court the duty of reëxamining the facts in the instance of all applicants for citizenship, who might appeal ; of construing and applying the treaties with, and the constitutions and laws, the usages and customs, of the respective tribes ; of reviewing their action through their legislative bodies, and the decisions of their tribal courts, and commissions; and of finally adjudicating the right of each applicant under the pressure of the advancement of each case on the docket to be disposed of as soon as possible ? Or, on the other hand, was it the intention of Congress to submit to this court only the question of the constitutionality or validity of the legislation in respect of the subject-matter ? We have no hesitation in saying that in our opinion the appeal thus granted was intended to extend only to the constitutionality or validity of the legislation affecting citizenship or the allotment of lands in the Indian Territory.

Two classes of cases are mentioned: (1) Citizenship cases. The parties to these cases are the particular Indian tribe and the applicant for citizenship. (2) Cases between either of the Five Civilized Tribes and the United States. Does the limitation of the inquiry to the constitutionality and validity of the legislation apply to both classes? We think it does.

It should be remembered that the appeal to the United States court for the Indian Territory under the act of 1896 was in respect of decisions as to citizenship only, and that in those cases the jurisdiction of the Dawes Commission and of the court was attacked on the ground of the unconstitutionality of the legislation. The determination of that question was necessarily in the mind of Congress in providing for the appeal to this court, and it cannot reasonably be supposed that it was intended that the question should be reopened in cases between the United States and the tribes. And yet this would be the result of the use of the words "affecting citizenship" in the qualification, if that qualification were confined to the last-named cases. The words cannot be construed as redundant and rejected as surplusage, for they can be given full effect, and it cannot be assumed that they tend to defeat, but rather that they are in effectuation of, the real object of the enactment. It is true that the provision is somewhat obscure, although if the comma after the words "all citizenship cases" were omitted, or if a comma were inserted after the words "the United States," that obscurity would practically disappear, and the rule is well settled that, for the purpose of arriving at the true meaning of a statute, courts read with such stops as are manifestly required. *Hammock* v. *Loan and Trust Company,* 105 U. S. 77, 84; *United States* v. *Lacher,* 134 U. S. 624, 628; *United States* v. *Oregon & California Railroad,* 164 U. S. 526, 541.

On any possible construction, in cases between the United States and an Indian tribe, no appeal is allowed, unless the constitutionality or validity of the legislation is involved; and it would be most unreasonable to attribute to Congress an intention that the right of appeal should be more extensive in

cases between an Indian tribe and an individual applicant for citizenship therein.

Reference to prior legislation as to appeal to this court from the United States court in the Indian Territory confirms the view we entertain.

By section five of the judiciary act of March 3, 1891, c. 517, 26 Stat. 826, as amended, appeals or writs of error might be taken from the District and Circuit Courts directly to this court in cases in which the jurisdiction of the court was in issue; of conviction of a capital crime; involving the construction or application of the Constitution of the United States; and in which the constitutionality of any law of the United States, or the validity or construction of any treaty made under its authority, was drawn in question.

By section six, the Circuit Courts of Appeals established by the act were invested with appellate jurisdiction in all other cases.

The thirteenth section read: " Appeals and writs of error may be taken and prosecuted from the decisions of the United States court in the Indian Territory to the Supreme Court of the United States, or to the Circuit Court of Appeals in the Eighth Circuit, in the same manner and under the same regulations as from the Circuit or District Courts of the United States, under this act."

The act of March 1, 1895, provided for the appointment of additional judges of the United States court in the Indian Territory and created a Court of Appeals with such superintending control over the courts in the Indian Territory as the Supreme Court of Arkansas possessed over the courts of that State by the laws thereof; and the act also provided that " writs of error and appeals from the final decisions of said appellate court shall be allowed, and may be taken to the Circuit Court of Appeals for the Eighth Judicial Circuit in the same manner and under the same regulations as appeals are taken from the Circuit Courts of the United States," which thus in terms deprived that court of jurisdiction of appeals from the Indian Territory trial court under section 13 of the act of 1891. Prior to the act of 1895, the United States court in the Indian

Territory had no jurisdiction over capital cases, but by that act its jurisdiction was extended to embrace them. And we held in *Brown* v. *United States,* 171 U. S. 631, that this court had no jurisdiction over capital cases in that court, the appellate jurisdiction in such cases being vested in the appellate court in the Indian Territory. Whether the effect of the act of 1895 was to render the thirteenth section of the act of 1891 wholly inapplicable need not be considered, as the judgments of the United States court in the Indian Territory in these citizenship cases were made final in that court by the act of 1896, and this would cut off an appeal to this court, if any then existed, whether the finality spoken of applied to the judgments of the trial court or of the appellate court. And when by the act of July 1, 1898, it was provided that "appeals shall be allowed from the United States courts in the Indian Territory direct to the Supreme Court of the United States, . . . under the rules and regulations governing appeals to said court in other cases," the legislation taken together, justifies the conclusion that the distribution of jurisdiction made by the act of March 3, 1891, was intended to be observed, namely, that cases falling within the classes prescribed in section five should be brought directly to this court, and all other cases to the appellate court, whose decision, as the legislation stands, would in cases of the kind under consideration be final. We do not think, however, that the analogy goes so far, in view of the terms of the act of 1898, that in cases brought here the whole case would be open to adjudication. The matter to be considered on the appeal, like the appeal itself, was evidently intended to be restricted to the constitutionality and validity of the legislation. The only ground on which this court held itself to be authorized to consider the whole merits of the case upon an appeal from the Circuit Court of the United States in a case in which the constitutionality of a law of the United States was involved, under section 5 of the act of March 3, 1891, c. 517, was because of the express limitation in another part of that section of appeals upon the question of jurisdiction; and there is no kindred limitation in the act now before us. *Horner* v. *United States,* 143 U. S. 570, 577. The judgments of the

court in the Indian Territory were made final, and appeals to this court were confined, in our opinion, to the question of constitutionality or validity only.

Was the legislation of 1896 and 1897, so far as it authorized the Dawes Commission to determine citizenship in these tribes, constitutional? If so, the courts below had jurisdiction on appeal.

It is true that the Indian tribes were for many years allowed by the United States to make all laws and regulations for the government and protection of their persons and property, not inconsistent with the Constitution and laws of the United States; and numerous treaties were made by the United States with those tribes as distinct political societies. The policy of the Government, however, in dealing with the Indian Nations was definitively expressed in a proviso inserted in the Indian Appropriation Act of March 3, 1871, c. 120, 16 Stat. 544, 566, to the effect:

"That hereafter no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe or power with whom the United States may contract by treaty: *Provided, further,* That nothing herein contained shall be construed to invalidate or impair the obligation of any treaty heretofore lawfully made and ratified with any such Indian nation or tribe," which was carried forward into section 2079 of the Revised Statutes, which reads:

"SEC. 2079. No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March third, eighteen hundred and seventy-one, shall be hereby invalidated or impaired."

The treaties referred to in argument were all made and ratified prior to March 3, 1871, but it is "well settled that an act of Congress may supersede a prior treaty and that any questions that may arise are beyond the sphere of judicial cognizance, and must be met by the political department of the

Government." *Thomas* v. *Gay*, 169 U. S. 264, 271, and cases cited.

As to the general power of Congress we need not review the decisions on the subject, as they are sufficiently referred to by Mr. Justice Harlan in *Cherokee Nation* v. *Southern Kansas Railway Company*, 135 U. S. 641, 653, from whose opinion we quote as follows:

"The proposition that the Cherokee Nation is sovereign in the sense that the United States is sovereign, or in the sense that the several States are sovereign, and that that nation alone can exercise the power of eminent domain within its limits, finds no support in the numerous treaties with the Cherokee Indians, or in the decisions of this court, or in the acts of Congress defining the relations of that people with the United States. From the beginning of the Government to the present time, they have been treated as 'wards of the nation,' 'in a state of pupilage,' 'dependent political communities,' holding such relations to the General Government that they and their country, as declared by Chief Justice Marshall in *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17, 'are considered by foreign nations, as well as by ourselves, as being so completely under the sovereignty and dominion of the United States, that any attempt to acquire their lands, or to form a political connection with them, would be considered by all as an invasion of our territory and an act of hostility.' It is true, as declared in *Worcester* v. *Georgia*, 6 Pet. 515, 557, 569, that the treaties and laws of the United States contemplate the Indian Territory as completely separated from the States and the Cherokee Nation as a distinct community, and (in the language of Mr. Justice McLean in the same case, p. 583;) that 'in the executive, legislative and judicial branches of our Government we have admitted, by the most solemn sanction, the existence of the Indians as a separate and distinct people, and as being vested with rights which constitute them a State, or separate community.' But that falls far short of saying that they are a sovereign State, with no superior within the limits of its territory. By the treaty of New Echota, 1835, the United States covenanted and agreed that the lands ceded to

the Cherokee Nation should at no future time, without their consent, be included within the territorial limits or jurisdiction of any State or Territory, and that the Government would secure to that nation 'the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government of the persons and property within their own country, belonging to their people or such persons as have connected themselves with them;' and, by the treaties of Washington, 1846 and 1866, the United States guaranteed to the Cherokees the title and possession of their lands, and jurisdiction over their country. Revision of Indian Treaties, pp. 65, 79, 85. But neither these nor any previous treaties evinced any intention, upon the part of the Government, to discharge them from their condition of pupilage or dependency, and constitute them a separate, independent, sovereign people, with no superior within its limits. This is made clear by the decisions of this court, rendered since the cases already cited. In *United States* v. *Rogers*, 4 How. 567, 572, the court, referring to the locality in which a particular crime had been committed, said: 'It is true that it is occupied by the tribe of Cherokee Indians. But it has been assigned to them by the United States as a place of domicil for the tribe, and they hold and occupy it with the consent of the United States, and under their authority. . . . We think it too firmly and clearly established to admit of dispute that the Indian tribes, residing within the territorial limits of the United States, are subject to their authority.' In *United States* v. *Kagama*, 118 U. S. 375, 379, the court, after observing that the Indians were within the geographical limits of the United States, said: 'The soil and the people within these limits are under the political control of the Government of the United States, or of the States of the Union. There exist within the broad domain of sovereignty but these two. . . . They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations; not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and

thus far not brought under the laws of the Union or of the State within whose limits they resided. . . . The power of the General Government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that Government, because it has never existed anywhere else, because the theatre of its exercise is within the geôgraphical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes.' The latest utterance upon this general subject is in *Choctaw Nation* v. *United States,* 119 U. S. 1, 27, where the court, after stating that the United States is a sovereign nation limited only by its own Constitution, said: 'On the other hand, the Choctaw Nation falls within the description in the terms of our Constitution, not of an independent State or sovereign nation, but of an Indian tribe. As such, it stands in a peculiar relation to the United States. It was capable under the terms of the Constitution of entering into treaty relations with the Government of the United States, although, from the nature of the case, subject to the power and authority of the laws of the United States when Congress should choose, as it did determine in the act of March 3, 1871, embodied in section 2079 of the Revised Statutes, to exert its legislative power.' "

Such being the position occupied by these tribes, (and it has often been availed of to their advantage,) and the power of Congress in the premises having the plenitude thus indicated, we are unable to perceive that the legislation in question is in contravention of the Constitution.

By the act of June 10, 1896, the Dawes Commission was authorized " to hear and determine the application of all persons who may apply to them for citizenship in said nations, and after such hearing they shall determine the right of such applicant to be so admitted and enrolled," but it was also provided :

" That in determining all such applications said Commission shall respect all laws of the several nations or tribes, not inconsistent with the laws of the United States, and all

treaties with either of said nations or tribes, and shall give due force and effect to the rolls, usages and customs of each of said nations or tribes: *And provided further,* That the rolls of citizenship of the several tribes as now existing are hereby confirmed, and any person who shall claim to be entitled to be added to said rolls as a citizen of either of said tribes, and whose right thereto has either been denied or not acted upon, or any citizen who may within three months from and after the passage of this act desire such citizenship, may apply to the legally constituted court or committee designated by the several tribes for such citizenship, and such court or committee shall determine such application within thirty days from the date thereof."

The act of June 7, 1897, declared that the Commission should "continue to exercise all authority heretofore conferred on it by law to negotiate with the Five Tribes, and any agreement made by it with any one of said tribes, when ratified, shall operate to suspend any provisions of this act if in conflict therewith as to said nation: *Provided,* That the words 'rolls of citizenship,' as used in the act of June tenth, eighteen hundred and ninety-six, making appropriations for current and contingent expenses of the Indian Department and fulfilling treaty stipulation with various Indian tribes for the fiscal year ending June thirtieth, eighteen hundred and ninety-seven, shall be construed to mean the last authenticated rolls of each tribe which have been approved by the council of the nation, and the descendants of those appearing on such rolls, and such additional names and their descendants as have been subsequently added, either by the council of such nation, the duly authorized courts thereof, or the Commission under the act of June tenth, eighteen hundred and ninety-six. And all other names appearing upon such rolls shall be open to investigation by such Commission for a period of six months after the passage of this act. And any name appearing on such rolls and not confirmed by the act of June tenth, eighteen hundred and ninety-six, as herein construed, may be stricken therefrom by such Commission where the party affected shall have ten days' previous notice that said Commis-

sion will investigate and determine the right of such party to remain upon such roll as a citizen of such nation : *Provided, also,* That any one whose name shall be stricken from the roll by such Commission shall have the right of appeal, as provided in the act of June tenth, eighteen hundred and ninety-six.

" That on and after January first, eighteen hundred and ninety-eight, all acts, ordinances and resolutions of the council of either of the aforesaid Five Tribes passed shall be certified immediately upon their passage to the President of the United States and shall not take effect, if disapproved by him, until thirty days after their passage: *Provided,* That this act shall not apply to resolutions for adjournment, or any acts, or resolutions, or ordinances in relation to negotiations with commissioners heretofore appointed to treat with said tribes."

We repeat that in view of the paramount authority of Congress over the Indian tribes, and of the duties imposed on the Government by their condition of dependency, we cannot say that Congress could not empower the Dawes Commission to determine, in the manner provided, who were entitled to citizenship in each of the tribes and make out correct rolls of such citizens, an essential preliminary to effective action in promotion of the best interests of the tribes. It may be remarked that the legislation seems to recognize, especially the act of June 28, 1898, a distinction between admission to citizenship merely and the distribution of property to be subsequently made, as if there might be circumstances under which the right to a share in the latter would not necessarily follow from the concession of the former. But in any aspect, we are of opinion that the constitutionality of these acts in respect of the determination of citizenship cannot be successfully assailed on the ground of the impairment or destruction of vested rights. The lands and moneys of these tribes are public lands and public moneys, and are not held in individual ownership, and the assertion by any particular applicant that his right therein is so vested as to preclude inquiry into his status involves a contradiction in terms.

The judgments in these cases were rendered before the pas-

sage of the act of June 28, 1898, commonly known as the Curtis Act, and necessarily the effect of that act was not considered. As, however, the provision for an appeal to this court was made after the passage of the act, some observations upon it are required, and, indeed, the inference is not unreasonable that a principal object intended to be secured by an appeal was the testing of the constitutionality of this act, and that may have had controlling weight in inducing the granting of the right to such appeal.

The act is comprehensive and sweeping in its character, and notwithstanding the abstract of it in the statement prefixed to this opinion, we again call attention to its provisions. The act gave jurisdiction to the United States courts in the Indian Territory in their respective districts to try cases against those who claimed to hold lands and tenements as members of a tribe and whose membership was denied by the tribe, and authorized their removal from the same if the claim was disallowed; and provided for the allotment of lands by the Dawes Commission among the citizens of any one of the tribes as shown by the roll of citizenship when fully completed as provided by law, and according to a survey also fully completed; and "that if the person to whom an allotment shall have been made shall be declared, upon appeal as herein provided for, by any of the courts of the United States in or for the aforesaid Territory, to have been illegally accorded rights of citizenship, and for that or any other reason declared to be not entitled to any allotment, he shall be ousted and ejected from said lands."

The act further directed, as to the Cherokees, that the Commission should "take the roll of Cherokee citizens of eighteen hundred and eighty, not including freedmen, as the only roll intended to be confirmed by this and preceding acts of Congress, and to enroll all persons now living whose names are found on said roll, and all descendants born since the date of said roll to persons whose names are found thereon; and all persons who have been enrolled by the tribal authorities who have heretofore made permanent settlement in the Cherokee Nation whose parents, by reason of their Cherokee blood,

have been lawfully admitted to citizenship by the tribal authorities, and who were minors when their parents were so admitted; and they shall investigate the right of all other persons whose names are found on any other rolls and omit all such as may have been placed thereon by fraud or without authority of law, enrolling only such as may have legal right thereto, and their descendants born since such rolls were made, with such intermarried white persons as may be entitled to citizenship under Cherokee laws." And that the Commission should make a roll of Cherokee freedmen, in compliance with a certain decree of the Court of Claims; and a roll of all Choctaw freedmen entitled to citizenship under the treaties and laws of the Choctaw Nation, and all their descendants born to them since the date of the treaty; and a roll of Chickasaw freedmen entitled to any rights or benefits under the treaty of 1866, and their descendants; and a roll of all Creek freedmen, the roll made by J. W. Dunn, under the authority of the United States, prior to March 14, 1867, being confirmed, and the Commission being directed to enroll all persons now living whose names are found on said roll, and their descendants, with "such other persons of African descent as may have been rightfully admitted by the lawful authorities of the Creek Nation."

The Commission was authorized and directed to make correct rolls of the citizens by blood of all the tribes other than the Cherokees, "eliminating from the tribal rolls such names as may have been placed thereon by fraud or without authority of law, enrolling such only as may have lawful right thereto, and their descendants born since such rolls were made, with such intermarried white persons as may be entitled to Choctaw and Chickasaw citizenship under the treaties and laws of said tribes."

It was also provided that "no person shall be enrolled who has not heretofore removed to and in good faith settled in the nation in which he claims citizenship."

The Commission was authorized to make the rolls descriptive of the persons thereon, so that they might be thereby identified, and to take a census of each of said tribes, "or

to adopt any other means by them deemed necessary to enable them to make such rolls;" and it was declared that "the rolls so made, when approved by the Secretary of the Interior, shall be final, and the persons whose names are found thereon, with their descendants thereafter born to them, with such persons as may intermarry according to tribal laws, shall alone constitute the several tribes which they represent."

The act provided further for the resubmission of the two agreements, with certain specified modifications, that with the Choctaws and Chickasaws, and that with the Creeks, for ratification to a popular vote in the respective nations, and that if ratified, the provisions of these agreements so far as differing from the act should supersede it. The Choctaw and Chickasaw agreement was accordingly so submitted for ratification August 24, 1898, and was ratified by a large majority, but whether or not the agreement with the Creeks was ratified does not appear.

The twenty-sixth section provided that, after the passage of the act, "The laws of the various tribes or nations of Indians shall not be enforced at law or in equity by the courts of the United States in the Indian Territory;" and the twenty-eighth section, that after July 1, 1898, all tribal courts in the Indian Territory should be abolished.

The agreement with the Choctaw and Chickasaw tribes contained a provision continuing the tribal government, as modified, for the period of eight years from March 4, 1898; but provided that it should "not be construed to be in any respect an abdication by Congress of power at any time to make needful rules and regulations respecting said tribes."

For reasons already given we regard this act in general as not obnoxious to constitutional objection, but in so holding we do not intend to intimate any opinion as to the effect that changes made thereby, or by the agreements referred to, may have, if any, on the status of the several applicants, who are parties to these appeals.

The elaborate opinions of the United States court in the Indian Territory by Springer, J., Clayton, J., and Townsend, J., contained in these records, some of which are to be found

in the report of the Commissioner of Indian Affairs for 1898, page 479, consider the subject in all its aspects, and set forth the various treaties, tribal constitutions and laws, and the action of the many tribal courts, commissions and councils which assumed to deal with it, but we have not been called on to go into these matters, as our conclusion is that we are confined to the question of constitutionality merely.

As we hold the entire legislation constitutional, the result is that all the

*Judgments must be affirmed.*

Mr. JUSTICE WHITE and Mr. JUSTICE McKENNA dissented as to the extent of the jurisdiction of this court only.