WALLACE et al. v. ADAMS et al.

(Circuit Court of Appeals, Eighth Circuit. February 21, 1906.)

No. 2,313.

1. INDIANS—CITIZENSHIP IN INDIAN TRIBES—POWER TO DETERMINE LEGISLATIVE, NOT JUDICIAL.

The power conferred upon the Dawes Commission and the United States courts in the Indian Terrritory by Act June 10, 1896, c. 398, 29 Stat. 339, 340, and upon the Supreme Court by Act July 1, 1898, c. 545, 30 Stat. 591, to determine who were citizens of the Choctaw and Chickasaw Nations, was legislative, and not judicial, and judgments thereunder were subject to any subsequent legislation of the United States respecting the question of citizenship, which was enacted before allotments of lands were made to successful litigants.

2. SAME—JUDGMENTS OF CITIZENSHIP RIGHTS CONFERRED BEFORE ALLOTMENTS.

Claimants of citizenship who secured judgments in their favor, which were final under these acts when they were rendered, and took possession of, and demanded suitable lands as their allotments, before their judgments were made reviewable, acquired no vested rights therein against subsequent legislation enacted before the lands were allotted to them.

3. SAME—JUDGMENTS OF CITIZENSHIP REVIEWABLE BY SUBSEQUENT ACT OF CONGRESS.

The judgments of citizenship rendered by the courts were conclusive upon the parties in the absence of subsequent legislation, but, though final when rendered, were voidable and reviewable by subsequent acts of Congress enacted before allotments of land were made under them.

4. SAME—CITIZENSHIP COURT—VALIDITY.

The Act July 1, 1902, c. 1362, 32 Stat. 641, whereby a citizenship court was created and empowered to review the final judgments of the courts of the United States under Act June 10, 1896, c. 398, 29 Stat. 339, which had been affirmed by the Supreme Court, was constitutional and valid.

against successful litigants who had not procured allotments before its passage.

**5. COURTS—TERRITORIAL COURTS LEGISLATIVE, NOT CONSTITUTIONAL.**

The United States courts in the territories and the Supreme Court in reviewing their decisions do not exercise the judicial power granted by article 3 of the Constitution, but a jurisdiction conferred upon them by the legislative department of the government by virtue of the sovereignty of the nation and the authority granted to Congress by section 3, art. 4, of the Constitution, to dispose of, and make all needful rules and regulations respecting the territory belonging the the United States.

**6. SAME—COURTS OF INDIAN TERRITORY—JURISDICTION—EJECTMENT FOR INDIAN ALLOTMENT.**

The United States courts in the Indian Territory have jurisdiction ot an action of ejectment brought by an Indian allottee against one in possession of his allotment.

**7. INDIANS—INDIAN ALLOTMENT—TITLE OF ALLOTTEE CHARGEABLE IN EQUITY IN THOSE COURTS WITH TRUST FOR RIGHTFUL CLAIMANT.**

The United States courts in the Indian Territory have jurisdiction in equity to charge the legal title to land evidenced by a certificate of allotment issued by the Dawes Commission under the direction of the Secretary of the Interior, with a trust in favor of the rightful claimant, either on account of an error of the commission in the construction of the law or its misapprehension of the facts induced through fraud or gross mistake.

**8. SAME—ALLOTMENT BY DAWES COMMISSION—EFFECT.**

The jurisdiction of the Dawes Commission, under the direction of the Secretary of the Interior, and the effect of their action in the allotment of lands of the Choctaw and Chickasaw Nations, are the same as the jurisdiction and the effect of the action of the Land Department of the United States in the disposition by patent of the public lands within its control.

**9. JUDGMENT—RECITALS—JURISDICTION.**

The recital in a judgment or decree that a required notice was "given to the defendants in conformity of law" raises the presumption of due service and of jurisdiction of the persons, in the absence of any inconsistent record or evidence.

(Syllabus by the Court.)

In Error to the United States Court of Appeals in the Indian Territory.

For opinion below, see 88 S. W. 308.

A. C. Cruce (W. I. Cruce and W. R. Bleakmore, on the brief), for plaintiffs in error.

Thomas Norman and H. H. Brown, for defendants in error.

George A. Mansfield, J. F. McMurray, and Melven Cornish, in behalf of the Choctaw and Chickasaw Nations as amici curiæ.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

SANBORN, Circuit Judge. This case is presented to test the validity of the decree of the Choctaw and Chickasaw citizenship court of December 17, 1902, which by its terms annulled all the judgments and decisions of the United States courts in the Indian Territory which had admitted persons to citizenship under the act of June 10, 1896, in either the Choctaw or Chickasaw Nation of Indians. These nations were the owners of a large and valuable tract of land in com-

mon, so that each and every member of each tribe had an equal undivided interest in the whole. Treaty with the Choctaw Nation of September 27, 1830, article 2, 7 Stat. 333; Treaty with the Choctaws and Chickasaws of June 22, 1855, articles 1, 2, and 3, 11 Stat. 611, 612. By the act of March 3, 1893, the Commission to the Five Civilized Tribes, generally known as the "Dawes Commission," was created and empowered to negotiate an extinguishment of the tribal title to these lands and an allotment thereof to the members of the tribes in severalty. 27 Stat. 645, c. 209, § 16. As soon as the allotment of these lands to the members of the tribes in severalty became imminent, citizenship therein became desirable. Many sought membership in the tribes whose claims to that relation were not conceded by the nations, and it became necessary to determine in some way who were the lawful citizens of these Indian tribes. Each nation had a roll of its acknowledged citizens and each denied the right of many applicants to membership. In this state of the case the United States, by Act June 10, 1896, 29 Stat. 339, 340, c. 398 (1) confirmed the rolls of citizenship of the tribes as they then existed, (2) authorized and required the Dawes Commission to hear the application and to determine the right of each applicant for citizenship in either of these tribes, (3) granted an appeal to the United States District Court in the Indian Territory to each party aggrieved by a decision of the commission upon this issue of citizenship, (4) declared that the judgment of that court should be final, and (5) required the commission to make a complete roll of the citizens of each of the tribes and to include therein the names of those whose rights of citizenship should be sustained by the courts. Hill, one of the defendants below in this action, and the only one whose rights it is necessary to consider because all the other defendants claim under him, was not enrolled or acknowledged by the Choctaw Nation as one of its citizens, but was, in fact, a member of the tribe by blood and entitled to all the rights of a citizen therein. He applied to the Dawes Commission to be admitted to membership. The commission denied his application. He appealed to the United States Court for the Southern District of the Indian Territory, and on March 8, 1898, that court adjudged that he was a member of the Choctaw Tribe by blood and that he should be admitted thereto as a citizen. Immediately thereafter, and during that month, he took possession of the land which is the subject of this action. This land is a tract not more valuable or extensive than he would be entitled to receive as his allotment if he were enrolled as a citizen of the Choctaw Nation. Before June, 1898, he placed improvements of the value of at least $1,000 upon this land, and has ever since retained the possession thereof with the intent to secure the same as his allotment.

On June 28, 1898, and while he was thus in possession of the land, Congress passed an act whereby it consented to the Atoka agreement with the Choctaw and Chickasaw Nations of April 23, 1897, empowered the Dawes Commission to allot the lands of these tribes to their members in severalty and provided that any member should be entitled to receive his allotment out of the lands in his possession if

he chose to do so. 30 Stat. 495, 498, c. 517. Hill made this choice. On July 1, 1898, Congress granted to the tribes an appeal to the Supreme Court from the judgment of March 8, 1898, in favor of Hill, and from all other judgments in the United States Courts in the Indian Territory in citizenship cases which involved the constitutionality or validity of any legislation affecting citizenship or the allotment of Indian lands. 30 Stat. 591, c. 545. The Choctaw Nation appealed from the judgment in favor of Hill, and his judgment was affirmed by the Supreme Court on May 15, 1899. Stephens v. Cherokee Nation, 174 U. S. 445, 19 Sup. Ct. 722, 43 L. Ed. 1041. In the proceedings which resulted in judgments of admission to citizenship in either the Choctaw or the Chickasaw Nation in the United States Courts notice had been given to only one of these nations and the courts had tried the actions upon the appeals de novo. The Indian Nations insisted that these proceedings were erroneous, and that the judgments were therefore unjust. On March 21, 1902, an agreement was made between the United States and the Choctaw and Chickasaw Nations, which was confirmed by Act Cong. July 1, 1902, c. 1362, 32 Stat. 641. This agreement and act were to the effect that the Choctaw and Chickasaw citizenship court, to be composed of three judges to be appointed by the President and confirmed by the Senate, should be created, that this court, upon the institution of a suit in equity therein by either or both of these tribes against 10 persons who had been admitted to citizenship or enrollment by the terms of the judgments of the United States courts in the Indian Territory, as representatives of all persons similarly situated, should inquire and determine (1) whether or not notice to each of the two nations was indispensable to the proceedings and judgments of admission to citizenship in those courts, (2) whether the proceedings of those courts should have been confined to a review of the action of the Dawes Commission upon the papers and evidence submitted to it or should have extended to a trial of the actions de novo, and (3) whether or not the judgments of the United States courts should be annulled on account of either or both of these alleged irregularities. The act and agreement also provided that, in case the citizenship court should decide that the judgments of admission to citizenship by the United States courts in the Indian Territory should be annulled or vacated, the papers in any action and that suit, wherein such a judgment had been rendered, should, upon seasonable application of either party, be transferred to the citizenship court which should proceed to a hearing and determination of it as the United States court ought to have proceeded, that the citizenship court should have appellate jurisdiction of the judgments of the United States courts in citizenship cases, and that its judgments should in all cases be final. Under this agreement and act the two nations brought a test suit in this citizenship court against J. W. Riddle and nine other persons who had been adjudged entitled to citizenship by the courts, as representatives of all others similarly situated, and on December 17, 1902, they obtained a decree from that court to the effect that the judgments of the United States courts in the Indian Territory whereby persons were

admitted to citizenship in the Choctaw and Chickasaw Nations, under the act of June 10, 1896, were annulled and vacated. The defendant Hill did not apply for a transfer to the citizenship court of the action in which he had secured his judgment, and no further proceedings were taken therein.

The action now in this court is an action of ejectment. Henry McSwain and Roma McSwain, by their guardian and next friend, were the plaintiffs below, and they are acknowledged citizens of the Chickasaw Nation who have received allotments of these lands from the Dawes Commission and have brought this action against Hill and those claiming under him to recover possession of them. Hill has presented his judgment in the United States court to the Dawes Commission, has demanded his enrollment as a citizen of the Choctaw Nation and the allotment to him of the land in dispute, but the commission has refused his request on the sole ground that his judgment was annulled by the decree of the citizenship court. Hill insists that that decree is void, and under the legislation which has been recited he is entitled to retain possession and to receive the land in dispute as his allotment unless his judgment of admission as a citizen of the Choctaw Nation has been avoided by that decree. The facts which have been recited appear in the complaint and answer in the action in hand or have been admitted by counsel in their briefs, and the defendant Hill prayed in his answer that the case be transferred to the equity docket, that his title be quieted, and that he have all other proper relief. A demurrer to his answer was sustained by the trial court and by the appellate court in the Indian Territory.

We are met at the threshold of the investigation of this case by the objection that the United States Court for the Southern District of the Indian Territory had no jurisdiction of this action because the land in dispute had been allotted to the plaintiffs by the Dawes Commission, and by the act of July 1, 1902, exclusive jurisdiction had been conferred upon that commission to determine under the direction of the Secretary of the Interior all matters relating to the allotment of land and to issue allotment certificates which should be conclusive evidence of the right of the allottee to the land therein described, and authority was given to the Indian agent at Union Agency to place allottees in possession of their lands upon application to him, free from the writ or process of any court. Chapter 1362, 32 Stat. 644, par. 23, 24. No application, however, appears to have been made to the Indian agent to place the plaintiffs in possession of the land here in dispute, and the rights and powers of the agent are not in question in this case. The plaintiffs commenced an action of ejectment in the trial court below which was met by the plea that in equity and good conscience the land which was its subject and the possession thereof were the property of the defendant and by a prayer for proper relief in equity. Jurisdiction of such an action was clearly granted to the courts in the Indian Territory by Act June 7, 1897, c. 3, 30 Stat. 83, which provides that on and after January 1, 1898, those courts shall have original and exclusive jurisdiction and authority to try and determine all civil causes in law and equity thereafter instituted, as well as by section 3, Act of June 28, 1898, 30 Stat. 496, c. 517.

Nor did the grant to the Dawes Commission and to the Secretary of the Interior of exclusive jurisdiction to determine matters relating to the allotment of land and to issue certificates which are conclusive evidence of the right of the allottee to the land therein described de-prive those courts of their jurisdiction in equity, after the Commission and the Secretary have exercised this power and exhausted their jurisdiction, to determine whether by error of law or through fraud or gross mistake the Commission and the Secretary have failed to allot the land to the party who was under the law entitled to it and have assigned it to one who had no right to it. The jurisdiction of the Commission and of the Secretary and the effect of their action in the allotment of the lands of the Choctaw and Chickasaw Nations are the same in effect as the jurisdiction and effect of the action of the Land Department of the United States in the disposition of the public lands within its control. The Commission under the direction of the Secretary constitutes a special tribunal vested with the judicial power to hear and determine the claims of all parties to allotments of these lands and to execute its judgments by the issue of the allotment certificates which constitute conveyances of the right to the lands to the parties who it decides are entitled to the property. This tribunal undoubtedly has exclusive jurisdiction to determine such claims and to issue such a conveyance. The allotment certificate when issued, like a patent to land, is dual in its effect. It is an adjudication of the special tribunal, empowered to decide the question, that the party to whom it issues is entitled to the land, and it is a conveyance of the right to this title to the allottee. U. S. v. Winona & St. Peter R. Co., 15 C. C. A. 96, 103, 67 Fed. 948, 955. Like a patent it is impervious to collateral attack. But, as in the case of a patent, if the Commission or the Secretary has been induced to issue the allotment certificate to the wrong party by an erroneous view of the law, or by a gross or fraudulent mistake of the facts, the rightful claimant is not remediless. He may avoid the decision and charge the legal title to the lands in the hands of the allottee, as he may that of the grant to a patentee, with his equitable right to it either on the ground that upon the facts found, conceded, or established without dispute at the hearing before the special tribunal, its officers fell into an error in the construction of the law applicable to the case which caused them to refuse to issue the certificate to him and to give it to another, or that through fraud or gross mistake it fell into a misapprehension of the facts proved before it which had a like effect. James v. Germania Iron Co., 46 C. C. A. 476, 479, 107 Fed. 597, 600. In the case in hand all parties concede in the briefs which have been submitted for our consideration that the land in question has been allotted and that allotment certificates have been issued to the plaintiffs and the questions presented will be considered in view of this admission. The defendant avers that the commission failed to allot the land to him and assigned it to the plaintiffs by reason of its erroneous view of the law, in that it held that his judgment of March 8, 1898, was vacated by the decree of the citizenship court. If that ruling was erroneous, the defendant was entitled to the possession of the property and to a decree in

143 F.—46

equity· that the right and title which the plaintiffs had secured by the allotment certificates were held by them in trust for his benefit, and the court in the Indian Territory had ample power to grant this relief.

Attention is called to section 2, Act June 28, 1898, 30 Stat. 495, c. 517, which provides that, when in the progress of any civil suit in the United States court in any district in the Indian Territory it shall appear to the court that the property of any Indian tribe is in any way affected by the issues being heard, the court is authorized and directed to make such tribe a party, and it is contended that both by virtue of this provision and under the general rule in equity the Choctaw and Chickasaw Tribes were indispensable parties to this action. But the lands in controversy here have been allotted to the plaintiffs below. They are no longer the property of the tribes, and none of their property can in any way be affected, even remotely, by this action unless the averments of the answer entitle the defendant to relief. The courts below were of the opinion that they did not, and hence it did not appear to them that any property of the tribes would be affected by the issues in this action. Until their opinions in this regard are overruled, it will not so appear, and, if they should be, this case must be remanded for testimony and hearing, and there will then be ample opportunity for them to consider and determine whether or not the Indian nations should be made parties. The record before us does not show that this question has yet been presented to the courts below, and hence it is not now here for our consideration or decision. We come, then, to the crucial question in the case.

The Constitution of the United States had been extended over and put into effect in the Indian Territory before the legislation involved in this suit was enacted, and counsel for the defendant Hill contend that because his judgment of admission to citizenship of March 8, 1898, was by the terms of the act of June 10, 1896, final when it was rendered and he took possession of and improved the land he occupies before June 28, 1898, and because by the act of the latter date (30 Stat. 498) the right to select this land which was then in his possession as his allotment was granted to him, his right thereto then vested, so that Congress had no power either by direct enactment or by the creation of a commission or court to review or annul his judgment or to deprive him of his right to this allotment. In support of this position they cite Rutherford v. Greene's Heirs, 2 Wheat. 196, 4 L. Ed. 218; Gaines v. Nicholson, 9 How. 356, 13 L. Ed. 172; U. S. v. Brooks, 10 How. 442, 13 L. Ed. 489; Doe v. Wilson, 23 How. 457, 16 L. Ed. 584; Crews v. Burcham, 1 Black, 352, 17 L. Ed. 91; Best v. Polk, 18 Wall. 112, 21 L. Ed. 805; New York Indians v. U. S., 170 U. S. 1, 18 Sup. Ct. 531, 42 L. Ed. 927; Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49. The argument is persuasive, and it is fortified by the suggestions that the defendant's judgment had been affirmed by the Supreme Court in 1899 and that the citizenship court was in reality a commission, and not a judicial tribunal. But none of the authorities cited contains a decision that one has a vested right in a judgment of citizenship which the legislative department of the United States may not lawfully disturb, although one of the

ultimate consequences of such a judgment, if undisturbed, might be an interest in land and other property. The opinions in the cases cited are limited to rulings that grants to designated persons or classes of persons are grants in præsenti, and that after they have taken effect the rights to the property have vested so that they may not be lawfully destroyed by legislation without compensation. The contention of counsel based upon decisions of this nature fails to give adequate consideration to the origin and character of the defendant's claim, to the nature of the issue determine by his judgment, and to the relation of the legislative, executive, and judicial departments of the United States to this claim and issue. Prior to the act of June 10, 1896, the right and the power to determine who were the citizens of the Choctaw and Chickasaw Nations was vested in those tribes. It was one of the fast disappearing attributes of the domestic dependent nationality of the Choctaws and Chickasaws, which was vested exclusively in their nations and was guaranteed to them by treaties with the United States. 7 Stat. 333, 334, art. 4; 11 Stat. 611, 613, art. 8; Buster v. Wright, 68 C. C. A. 505, 508, 135 Fed. 947, 950. Those nations had rejected the defendant's claim that he was a citizen of the Choctaw Nation. That issue had become res adjudicata between him and the nations, and it was not cognizable by the judiciary of the United States or of the Indian Territory. No court had any jurisdiction to determine that he was a member of the Choctaw Tribe or that he should be admitted to citizenship therein. He was without remedy for the lawful refusal of the Choctaw Nation to admit him to citizenship, and hence without right to membership in that tribe.

The United States by its superior might took from the Choctaw and Chickasaw Nations the power to determine who their citizens should be, which had been repeatedly guaranteed to them by treaties, and authorized the Dawes Commission and the United States court in the Indian Territory to decide this issue, by the act of June 10, 1896. Here is the origin of every right of the defendant involved in this action. The maintenance by him of any claim in any court necessarily concedes the power of the legislative department of the government to create or to revive, and to enforce his demand for citizenship, because without that concession the provisions of the act of June 10, 1896, in this regard are void, and the defendant's claim is conclusively adjudged to be baseless by its rejection by the Choctaw Nation. But, if the legislative department of the United States had the constitutional power to create or to revive the defendant's claim and to enforce it, it necessarily had the same power to determine whether or not it would revive or enforce it and to select its own method of deciding these questions. It might have determined this issue itself and have declared by direct enactment that the defendant Hill was a citizen of the Choctaw Nation. It might have empowered a committee, an Indian agent, a commission, a board, or a court to examine and determine that question on its behalf, and as the determination of this question of citizenship was a purely legislative and administrative function, and not a judicial one, Congress necessarily had the authority under the Constitution at any time before an allotment of land under its previous acts had been finally made

to the defendant, and his right to the land had thereby become vested, to repeal its previous legislation, to change its method of determining the issue, to strike down any decision that had been made under its previous acts, to prescribe a new method of deciding the question, or to refuse to determine it altogether and leave the claim of the defendant as it found it, conclusively barred by its rejection by the Choctaw Nation. A striking and persuasive analogy to the power of the legislative department of the government to determine this question of citizenship and to dispose of the lands of the tribes is found in its jurisdiction to dispose of the public lands of the United States. Congress is vested with lawful authority to dispose of these lands. It has authorized the Land Department of the United States to decide who are entitled to them under the general pre-emption, homestead, and other acts provided for their disposition. But the legislative department of the United States may at any time before one who has occupied and improved land with a view to its pre-emption has completed all the preliminaries, entered and paid for the land he seeks to acquire, lawfully convey it to another, although the Land Department has already decided that the occupant is entitled to it. Occupation, improvement, compliance with the law, and the favorable decisions of the Land Department give rise to valuable and enforceable rights to public land as against other claimants in the absence of subsequent legislation. Nothing short of entry and payment confer upon a settler vested rights against the United States which impair in any respect the plenary power of its legislative department to dispose of the land to another or to withdraw it from sale for the use of the government. Campbell v. Wade, 132 U. S. 34, 38, 10 Sup. Ct. 9, 33 L. Ed. 240; Frisbie v. Whitney, 9 Wall. 187, 192, 19 L. Ed. 668; Yosemite Valley Case, 15 Wall. 77, 78, 21 L. Ed. 82; Hosmer v. Wallace, 97 U. S. 575, 581, 24 L. Ed. 1130; Gonzales v. French, 164 U. S. 338, 344, 17 Sup. Ct. 102, 41 L. Ed. 458; Grisar v. McDowell, 73 U. S. 363, 18 L. Ed. 863; Trenouth v. San Francisco, 100 U. S. 251, 25 L. Ed. 626; La Abra Silver Min. Co. v. U. S., 175 U. S. 423, 20 Sup. Ct. 168, 44 L. Ed. 223; Emblen v. Lincoln Land Co., 42 C. C. A. 499, 503, 102 Fed. 559, 563. In the case last cited the complainant had instituted a contest in the Land Department in the year 1888 against an entryman, Weed, to secure a cancellation of his entry, and to obtain for the contestant the right to enter the land which is granted by section 2, c. 89, 21 Stat. 141, to any person who procures the avoidance of a previous entry. After a long series of adverse decisions the Secretary of the Interior finally, in 1894, set aside the rulings which had been made, and directed the local land officers to hear the case anew. The complainant had paid fees to the land officers, had conducted his contest for six years, had finally secured an avoidance of the decisions against him, and was pressing the case to a hearing before the local land officers where a time had been set for the trial, when Congress passed an act to the effect that the entry of Weed was confirmed and that a patent should be issued to him forthwith. This court decided in accordance with the opinion of the Supreme Court in the cases cited above that the contestant had acquired no vested rights against the United States

and its legislation, and that the act of Congress which granted the land to another was neither unconstitutional nor invalid. The Act July 1, 1902, c. 1362, 32 Stat. 641, which created the citizenship court and authorized it to review the judgment of the United States court in the Indian Territory of March 8, 1898, in favor of the defendant, was of the same nature. It was but a modification or an amendment of, or an addition to, the method prescribed by the legislative department of the government for the determination of the question whether or not the defendant Hill was a citizen of the Choctaw Nation by its acts of June 10, 1896 (29 Stat. 340, c. 398), and July 1, 1898 (30 Stat. 591, c. 545). When it was passed, the Dawes Commission, to whom Congress had delegated the power to distribute the lands of the tribes, had not allotted the land in dispute to the defendant. He had, therefore, acquired no vested right in it as against subsequent legislation of the United States because, until such an allotment was made, all the proceedings determinative of citizenship and of distribution which derived their force and effect from the legislative power of the United States alone were necessarily subject to the further exercise of that authority.

The fact that the effect of the act of July 1, 1902, has been to avoid final judgments of the United States courts in the Indian Territory, which had been affirmed by the Supreme Court, has not been disregarded. In the rendition of those judgments, however, those courts were not exercising any of the judicial power of the United States conferred by the third article of the Constitution. They were not constitutional, but legislative courts of the United States, exercising a jurisdiction conferred upon them by Congress by virtue of the sovereignty of the nation and of section 3 of article 4 of the Constitution, which empowers Congress to dispose of, and make all needful rules and regulations respecting the territory belonging to the United States. American Ins. Co. v. Canter, 1 Pet. 511, 546, 7 L. Ed. 242; Benner v. Porter, 9 How. 235, 242, 243, 13 L. Ed. 119; Hornbuckle v. Toombs, 18 Wall. 648, 655, 21 L. Ed. 966; Good v. Martin, 95 U. S. 90, 98, 24 L. Ed. 341; Clinton v. Englebrecht, 13 Wall. 434, 447, 20 L. Ed. 659. In the case last cited Chief Justice Chase, speaking of the courts of the then territory of Utah, said: "There is no Supreme Court of the United States, nor is there any District Court of the United States, in the sense of the Constitution, in the territory of Utah." Now, as the power conferred upon the courts in the Indian Territory and upon the Supreme Court respecting the decision of the question who were citizens of the Indian tribes was purely legislative and administrative, and the entire question still remained subject to congressional action, the legislative department had the same power at any time before allotments were made and the rights of allottees became vested to disregard or to authorize a review of the decisions of these courts by other tribunals that it would have had to have disregarded or reviewed the decisions of an Indian agent, a commission, or a committee, if it had conferred this power upon them. The decisions of the Supreme Court in Stephens v. Cherokee Nation, 174 U. S. 445, 488, 19 Sup. Ct. 722, 43 L. Ed. 1041, and

Cherokee Nation v. Hitchcock, 187 U. S. 294, 306, 23 Sup. Ct. 115, 47 L. Ed. 183, adequately sustain this conclusion. In the former case that court expressly decided that the defendant and others who had secured judgments of admission to citizenship under the act of June 10, 1896, which were final under the legislation in existence when they were rendered, had no vested rights therein or in the lands or property of the tribes to which these judgments would have entitled them, and that the subsequent act of July 1, 1898, which gave to the tribes appeals to the Supreme Court from these judgments, was constitutional, and declared that:

"The lands and moneys of these tribes are public lands and public moneys, and are not held in individual ownership, and the assertion of any particular applicant that his right therein is so vested as to preclude inquiry into his status involves a contradiction in terms."

Earlier decisions of that court are to the effect that the legislative department of the Government has ample power by subsequent enactment to grant a new trial or a review by a suitable tribunal of judgments final under the laws in force when they were rendered. Sampeyreac v. U. S., 7 Pet. 222, 235, 8 L. Ed. 665; Freeborn v. Smith, 2 Wall. 160, 17 L. Ed. 922; Garrison v. New York, 21 Wall. 196, 204, 22 L. Ed. 612; Freeland v. Williams, 131 U. S. 405, 412, 9 Sup. Ct. 763, 33 L. Ed. 193; Essex Public Road Board v. Skinkle, 140 U. S. 334, 11 Sup. Ct. 790, 35 L. Ed. 446. In Sampeyreac v. U. S., 7 Pet. 222, 235, 8 L. Ed. 665, a decree of a court which established a title to land was rendered on November 24, 1827. After this decree had become final under existing laws an innocent purchaser bought the established title. On May 8, 1830, Congress passed an act which authorized the claimants defeated by the original decree, which had then been final for more than two years, to maintain a bill of review to set it aside. Such a bill was exhibited, a decree was rendered thereon which avoided the original decree and took the property from the innocent purchaser, and the Supreme Court sustained the act of Congress which allowed this review and the decree which followed it. There can be no doubt under these decisions that Congress had plenary power to authorize a review of the final judgments of the courts in the Indian Territory and of the Supreme Court in these citizenship cases. The contention that the act of 1902 is unconstitutional because it is class legislation is answered by the decision of the Supreme Court in the Stephens Case which sustained the act of July 1, 1898, which was of the same character. The suggestion that the citizenship court was a commission, and not a judicial tribunal, is immaterial, because the power of the legislative department of the government to authorize the review of the judgments of citizenship by a commission, a committee, or an agent was as complete as it was to authorize that review by a court. It had plenary authority to review the judgments itself or to create or select a tribunal to its liking for the purpose. In view of the considerations and authorities to which reference has now been made, our conclusions are: The power conferred upon the Dawes Commission and the United States courts in the Indian Ter-

ritory by the act of June 10, 1896, and upon the Supreme Court by the act of July 1, 1898, to determine who were citizens of the Choctaw and Chickasaw Nations, was legislative and not judicial, and all judgments and proceedings thereunder were subject to any subsequent legislation of the United States respecting the question of citizenship, which was enacted before allotments of land were made to the successful litigants under the previous legislation. Claimants of citizenship who secured judgments in their favor which were final under the acts of 1896 and 1898 when they were rendered and took possession of, and demanded suitable tracts of, land as their allotments, before their judgments were made reviewable, acquired no vested rights therein against subsequent legislation enacted before the lands were allotted to them. The judgments of citizenship rendered by the courts were conclusive upon the parties to them in the absence of subsequent legislation; but, though final when rendered, they were voidable and reviewable by subsequent acts of Congress passed before allotments of land were made under them. The act of July 1, 1902, whereby a citizenship court was created and empowered to review the final judgments of the courts of the United States under the act of June 10, 1896, which had been affirmed by the Supreme Court under the act of July 1, 1898, was constitutional and impregnable to the attacks of the successful litigants, who had not secured allotments of land before its passage.

Finally counsel for defendant insist that he is not bound by the decree of the citizenship court (1) because he was not one of the 10 persons named as defendants therein, but as Congress had plenary power to directly reverse the judgments of citizenship, or to determine in what way they should be reversed, its enactment that the 10 persons should stand as the representatives of all others similarly situated was not ineffective; (2) because there was no proof in the citizenship court, and there is no finding in the decree, that he was one of the persons similarly situated with the 10 defendants named, but the decree avoids all the judgments of the courts in the Indian Territory, whereby in cases appealed from the decisions of the Dawes Commission under the act of June 10, 1896, any of the defendants named or any of the persons simliarly situated was adjudged a citizen of the Choctaw or Chickasaw Nation, and the answer of the defendant in this action that upon such an appeal he secured a judgment of one of those courts that he was a citizen of the Choctaw Nation sufficiently discloses the fact that he was similarly situated with the 10 defendants named in the decree of the citizenship court and brings him clearly within its terms; (3) because the act of 1902 required that notice of the pendency in the citizenship court of the suit there brought and of the time for answering the bill should be published for four weeks in two newspapers generally circulating in the Choctaw and Chickasaw Nations 30 days before the time for answering the bill expired, and the decree does not recite or adjudge that this notice was published (32 Stat. 647), but the 10 defendants are named in the title of the decree as defendants "for themselves and as representatives of all persons similarly situated, claiming to be mem-

bers of the Choctaw and Chickasaw Nations, by virtue of alleged decrees of the United States Court for the Central and Southern Districts of the Indian Territory sitting respectively at South McAlester and Ardmore, and commonly known as Court Claimants." The decree recites: "The court finds that due and legal notice of the pendency and prayer of this suit has been given to the defendants herein in conformity of law," and it adjudges that the judgments in favor of those similarly situated as well as the judgments in favor of the 10 defendants named and in favor of other defendants who appeared be annulled.

Counsel concede that the recital in the decree that the notice had been given "in conformity of law" is sufficient, in the absence of any inconsistent record or evidence, to raise the presumption of the legal publication of the notice and of the jurisdiction of the court over the persons of all who are affected by the decree (Applegate v. Lexington, etc., Min. Co., 117 U. S. 255, 269, 6 Sup. Ct. 742, 29 L. Ed. 892; Foster v. Givens, 14 C. C. A. 625, 632, 67 Fed. 684, 691; Beattie v. Wilkinson (C. C.) 36 Fed. 646; Rumfelt v. O'Brien, 57 Mo. 569, 572; Harris v. Lester, 80 Ill. 307, 315; Mulvey v. Gibbons, 87 Ill. 367, 380; 17 Am. & Eng. Enc. of Law 1082), were it not for the fact that this recital is limited by the words "the defendants herein," but they insist that these words refer to the 10 defendants whose names are written in the title of the decree, and to them alone. Such a construction, however, is inconsistent with the decree against those similarly situated which could have been lawfully rendered only in case the publication of the notice had been made, and the words "the defendants herein" must, therefore, be given a broader interpretation, and must include those who were similarly situated as well as those whose names were written in the title of the decree.

The defendant pleaded the decree of the citizenship court in his answer and took upon himself the burden of showing by adequate averments why it did not estop him from asserting that he was a citizen of the Choctaw Nation. He alleged, it is true, that he was not similarly situated with the defendants named in that decree, but he failed to set forth any difference between his situation and that of the 10 defendants there named, while his answer disclosed the fact that he had secured a like judgment upon a similar appeal. He alleged, it is true, that he was not a party to the suit in the citizenship court, and that no notice was ever served upon him therein, but he failed to allege that the notice of the pendency of that action was not published in the manner directed by the act of Congress. These averments were insufficient to withdraw the defendant from the estoppel of the decree, and the judgments of the courts in the Indian Territory against him in the action now under consideration must be affirmed.

It is so ordered.