## ROBINSON v. OWEN *et al.*

No. 1330.   Opinion Filed December 12, 1911.

(119 Pac. 995.)

1.   **INDIANS—Lands—Allotments—Persons Entitled.**   A petition, alleging that plaintiff's father was a free colored person, residing in the Cherokee country at the commencement of the War of the Rebellion, but who left during the war, and did not return within six months after the adoption of the treaty of 1866, but who, notwithstanding the fact, had been recognized as a freedman by the Cherokee Nation, and the Secretary of the Interior, and had been enrolled on what is known as the Wallace roll, as well as the Kerns-Clifton roll, and had been accorded all the rights of citizenship, and had selected land in said nation as allotments for himself and children, and had been permitted to place tentative filing on such land so chosen by him as such allotment, but who, when the Dawes Commission was authorized and directed to determine the citizenship of said nation and prepare a new roll, made application for himself and his children, including the plaintiff in this case, to be enrolled as citizens, and was, on March 11, 1904, denied citizenship, by reason of the fact that the father, after leaving the said Cherokee country during the war, had not returned thereto within six months from the date of the adoption of the treaty of 1866, and the tentative filing on the land selected as allotments thereafter having been canceled by the Secretary of the Interior, and patent issued to said land to another allottee now in possession, does not state facts sufficient to constitute a cause of action in favor of the plaintiff as against the said allottee, declaring the latter to hold the legal title to said land in trust for the benefit of the plaintiff.

2.   **SAME — Allotments — Jurisdiction—Patent to Wrong Person.**   A court of equity has power to grant relief in a case where the Dawes Commission or the Secretary of the Interior were induced to cause to be issued a patent to land to the wrong person, where the issuance of such patent was occasioned by an erroneous view or construction of the law applicable, or to a gross or fraudulent mistake of facts; and in such a case the patent may be canceled and the allottee held to be the trustee of the legal estate of such land for the use and benefit of the one entitled thereto, and in such case the courts of this state have jurisdiction.

3.     **SAME—Lands—Allotments.**   Under the facts alleged in the petition, and as stated in the opinion, the plaintiff is not entitled to the relief prayed for.

(Syllabus by Robertson, C.)

*Error from District Court, Washington County; John J. Shea, Judge.*

Action by William D. Robinson, a minor, by his father and next friend, W. H. Robinson, against Charles Owen, individually and as administrator of the estate of Oscar Parsons, deceased, and others.   Judgment for defendants, and plaintiff brings error. Affirmed.

*Joseph Porter,* for plaintiff in error.

*George, Campbell & Ray,* for defendants in error.

Opinion by ROBERTSON, C.   The court below sustained a demurrer to the petition.   Plaintiff elected to stand on the petition, and refused to plead further, and judgment was rendered against him, dismissing the petition and dissolving the temporary injunction that had theretofore been granted, and for costs.

The petition shows that plaintiff, William D. Robinson, a minor, is a son of W. H. Robinson, who describes himself as "free colored person, residing in the Cherokee country, now Oklahoma, at the commencement of the War of the Rebellion." Said plaintiff's rights, whatever they may be, are derived as son and descendant of his said father, W. H. Robinson.   During the war, the father left the Cherokee country, but claims to have returned in time to save his rights under article 9 of the Cherokee treaty of 1866 (Act July 19, 1866, 14 Stat. 801), which article reads as follows:

"All freedmen who have been liberated by the voluntary acts of their former owners, or by law, as well as all free colored persons, who resided in the Cherokee country at the commencement of the War of the Rebellion and were residents therein at the date of said treaty, or who had returned thereto within six months of said last mentioned date, and their descendants, were admitted into and became a part of the Cherokee Nation and entitled to equal rights and to participate in the Cherokee funds and

common property in the same manner as Cherokee citizens of Cherokee blood."

But in the decision of the Commission to the Five Civilized Tribes, which is set up as an exhibit (Record, page 26), this allegation appears to be untrue.

The Cherokee National Council, by Acts of November 26, 1866, November 25, 1890, and May 3, 1894, restricted the distribution of funds derived from the sale of public domain of the Nation to citizens of the Nation, by blood, thus discriminating against plaintiff's father, which, he contends, was a violation of his treaty rights.

By virtue of an act of Congress of March 2, 1889, a commission was appointed to prepare a roll of freedmen, and to enable the Nation to determine who were the individual freedmen entitled to participate in the funds of the Nation. Said commission prepared a roll, known as the Wallace roll, and plaintiff's father, W. H. Robinson, was placed on this roll, and was thereby accorded by the Secretary of the Interior and the Cherokee Nation all the rights of a Cherokee citizen. Thereafter, by agreement of the Cherokee Nation and the freedmen, the Wallace decree, which the United States Court of Claims had entered in a case reviewing the Wallace bill, was set aside, and a substitute decree was entered, and established what is known as the Kerns-Clifton roll, and forever enjoined, restrained, and prohibited the United States or the Cherokee Nation from in any manner discriminating against the freedmen. This Kerns-Clifton roll, as thus established, was duly approved by the Secretary of the Interior, with the name of plaintiff's father, W. H. Robinson, and his children thereon, and by virtue thereof they claim all the rights and privileges accorded other Cherokee citizens of Cherokee blood. Plaintiff was born after the Kerns-Clifton roll was made. After said roll had been made and approved, with W. H. Robinson and his children's names thereon, said W. H. Robinson purchased from a registered Delaware Indian, under the Cherokee laws then in force, a large tract of land, with right of possession, with the view of allotting himself and children thereon, and which tract

included the landed involved in this controversy. The Dawes Commission, by act of Congress June 28, 1898, among other things, was authorized and directed to make a roll of the Cherokee freedmen in strict compliance with the decree of the Court of Claims, heretofore mentioned. Plaintiff's father made application to the Commission to have his name and those of his children transferred from the old Kerns-Clifton roll to the new roll, then being prepared by the Dawes Commission, and to add thereto the name of the plaintiff, William D. Robinson, a son born since the Kerns-Clifton roll had been made. This the Dawes Commission refused to do, which act of the Commission was thereafter approved by the Secretary of the Interior, and thereby plaintiff's said father and children were not placed upon the new roll made by the Dawes Commission. Later, however, the Secretary of the Interior ordered the Dawes Commission to reverse its decision and to enroll these applicants, but, for reasons not set out, the said Commission refused to do so, presumably, however, because the act of June 10, 1896 (chapter 398, 29 Stat. 339), required all appeals from decisions of the Commission to the Five Civilized Tribes, affecting claims of citizenship, to be taken to the United States District Court.

Thereafter the Secretary of the Interior and the Cherokee Nation conveyed the title to the land claimed by plaintiff by patent to one Oscar W. Parsons, and plaintiff claims that such patent is a cloud upon his title to the land in question, which he had, long prior to said adverse decisions, selected as his allotment, and which he at one time filed upon, but which filing had been canceled by the Secretary of the Interior and the Dawes Commission. Later Parsons died, and the defendant Owen, as administrator, sold his estate, and passed the legal title thereto to parties unknown to this plaintiff at the time of filing this suit, except the record in the office of the register of deeds of Washington county, Okla., shows that Charles Owen was the owner by warranty deed from the defendant Connelly and wife of an undivided one-half interest in said land, which said deed was filed February 25, 1909, and, as plaintiff avers, is a cloud upon his

title. January 2, 1908, the defendant Connelly, claiming to be the owner of said land, commenced an action of unlawful detainer before a justice of the peace of Washington county against plaintiff's father, said W. H. Robinson, and on January 21, 1909, on appeal to the county court, a default judgment was rendered in said cause against plaintiff's father, and ordering restitution of said land to said Connelly, and for damages for the unlawful detention.

In addition to the foregoing, it is shown by the petition that plaintiff claims his right to be enrolled by virtue of the fact that his father's name was upon the Wallace roll, and also upon the Kerns-Clifton roll, notwithstanding he was left off the roll prepared by the Commission to the Five Civilized Tribes. He charges also that the latter roll was not prepared according to law, and especially in accordance with the terms of the agreed decree of the Court of Claims; his idea seeming to be that the decree validated the former rolls, and secured full citizen's rights to all persons whose names appeared thereon. This decree (Record, page 23) does acknowledge all names on the authenticated Cherokee roll of 1880, and provides that they and their descendants should be enrolled as Cherokee freedmen; and the first paragraph of said decree, as found on page 22 of the record, also adjudges that all freedmen who had been liberated by voluntary acts of their former owners, or by law, as well as all free colored persons, who were in the Cherokee country at the commencement of the War of the Rebellion, and who were residents therein at the date of said treaty, and who should return to said Cherokee country within six months thereafter, and their descendants, should be enrolled.

The treaty of 1902 (Act July 1, 1902, c. 1375, 32 Stat. 716) with the Cherokee Nation provided that the Commission to the Five Civilized Tribes should prepare another and final roll in strict compliance with section 21 of the Curtis act (Act June 28, 1898, 30 Stat. 495), which provides that the roll should be made under the terms of the decree of the Court of Claims, made on February 3, 1898. By authority of this act, the Commission to

the Five Civilized Tribes investigated the status of plaintiff's father as a citizen, and denied him enrollment, on March 11, 1904, in the following language:

"The evidence shows that the said William H. Robinson and son were free colored persons, residing in the Cherokee Nation at the commencement of the Rebellion; that they went to Kansas during the Rebellion, and that they did not return to and establish their residence in the Cherokee Nation within the time specified in the decree of the Court of Claims, rendered on February 3, 1896, in the case of *Moses Whitmore, Trustee, v. The Cherokee Nation et al.,* for the return of freedmen to said nation. It further appearing that all the other applicants herein were born since 1866, and are the respective descendants of, and claim their rights to enroll through, * * * William H. Robinson and his wife, Millie Robinson, the latter claiming only as a Cherokee freedman by intermarriage; and that such descendants have no greater rights to enrollment than said ancestors, through whom they claim. None of the applicants herein can be identified on the 1880 authenticated Cherokee roll. It is therefore the opinion of this Commission that the applications for the enrollment of Wm. H. Robinson * ' * * and Wm. D. Robinson * * * as Cherokee freedmen should be denied, under the provisions of section 21 of the act of Congress, approved June 28, 1898, and it is so ordered."

It further appears that plaintiff had made application to file on land in controversy, but after said decision the said application was canceled by the Commissioner of Indian Affairs on February 12, 1907, and the land was allotted to Oscar W. Parsons, now deceased, but of whose estate the defendant Charles Owen is administrator.

It also appears that the Cherokee Nation made up a roll in 1880, from which was excluded the names of plaintiff's father, and other like claimants, which roll was referred to in the decree of the Court of Claims as the "Authenticated Cherokee Roll," which roll was deposited with and recognized by the Secretary of the Interior, and which the Commission to the Five Civilized Tribes followed in making the final roll.

The prayer of the petition in the case at bar asks that said defendants Owen and Connelly be adjudged to be the trustees

of the legal title to plaintiff's allotment, as described, and that they hold it for the use and benefit of plaintiff, and that he be adjudged to be the legal owner of the same, free and clear from all incumbrances, and that the county judge and sheriff of Washington county, and each of said defendants, and their agents, servants, and employees, be forever enjoined from in any manner interfering with plaintiff's possession.

The rights, therefore, which this plaintiff claims are those only which he may have by virtue of his claim to citizenship in the Cherokee Nation. Article 9 of the treaty, *supra*, provided, among other things, that only those freedmen who had been liberated by the voluntary acts of their former owners, or by law, as well as all free colored persons, who resided in the Cherokee country, at the commencement of the Rebellion, and were residents therein on the date of said treaty, or who had returned thereto within six months of last-mentioned date, and their descendants, were entitled to participate in the distribution of the Cherokee national funds, and the other common property of the nation, and, notwithstanding the fact that plaintiff's father had been enrolled as a citizen on the Wallace roll, also the Kerns-Clifton roll, the Commission to the Five Civilized Tribes, under the authority of the act of Congress of June 10, 1896, having the question of citizenship of plaintiff's father and his descendants under consideration, on March 11, 1904, decided that, while William H. Robinson was a free colored person, residing in the Cherokee Nation at the commencement of the Rebellion, yet he went to Kansas during the Rebellion, and did not return to and establish his residence in the Cherokee Nation within the time provided in the decree of the Court of Claims, as rendered on February 3, 1896; that therefore he was not entitled to enrollment as a freedman of the Cherokee Nation.

The act of Congress of June 10, 1896, provides, among other things:

"That said Commission is further authorized and directed to proceed at once to hear and determine the application of all persons who may apply to them for citizenship in any of the said nations, and after such hearing that it determine the right of

such applicant to be so admitted and enrolled. * * * Provided, however, that in determining all such applications said Commission shall respect all laws of the several nations or tribes, not inconsistent with the laws of the United States, and all treaties with either of said nations or tribes, and shall give due force and effect to the rules, usages and conditions of each of said nations or tribes." (3 Fed. Stat. Ann. 431.)

Said act further provided that if the tribe, or any person, be aggrieved by the decision of the tribal authorities, or the Commission provided for in this act, it, or he, may appeal from such decision to the United States District Court. It does not appear that plaintiff or his father was aggrieved by the decision of the Commission to the Five Civilized Tribes, as to the disposition of the question of their citizenship, as made and entered on March 11, 1904, for no appeal was taken from said decision, notwithstanding the fact that, prior to said date, the father had been recognized as a citizen by the Cherokee Nation and by the Secretary of the Interior; yet the authority of the Commission, as conferred by the Curtis act (Act Cong. June 28, 1908, 30 Stat. 495), was sufficient to take away any such claims as he may have had to citizenship in said Nation prior to the decision of said Commission. The question of citizenship, which, prior to the passage of the Curtis act, *supra*, was controlled exclusively by the Cherokee Nation, was thereby taken from it by virtue of the superior might of the United States, and the power to determine who their citizens were was vested in the Commission to the Five Civilized Tribes and the United States Court.

In *Wallace v. Adams*, 143 Fed. 716, 74 C. C. A. 540 *et seq.*, this subject is thoroughly discussed by Circuit Judge Sanborn, in the following language:

"The United States, by its superior might, took from the Choctaw and Chickasaw Nations the power to determine who their citizens should be, which had been repeatedly guaranteed to them by treaties, and authorized the Dawes Commission and the United States Court in the Indian Territory to decide this issue by the act of June 10, 1896. *Here is the origin of every right of the defendant involved in this action.* The maintenance by him of any claim in any court necessarily concedes the power of the legislative department to the government to create or re-

vive, and to enforce his demand for citizenship, because without that concession the provisions of the act of June 10, 1896, in this regard are void, and the defendant's claim is conclusively adjudged to be baseless by its rejection by the Choctaw Nation. But, if the legislative department of the United States had the constitutional power to create or revive the defendant's claim and to enforce it, it necessarily had the same power to determine whether or not it would revive or enforce it, and to select its own method of deciding these questions. It might have determined this issue itself, and have declared by direct enactment that the defendant Hill was a citizen of the Choctaw Nation. It might have empowered a committee, an Indian agent, a commission, a board, or a court to examine and determine that question on its behalf, and as the determination of the question of citizenship was a *purely legislative and administrative function, and not a judicial one,* Congress necessarily had the authority, under the Constitution. at any time before an allotment of land under its previous acts had been finally made to the defendant, and his right to the land thereby become vested, to repeal its previous legislation, to change its method of determining the issue, to strike down any decision that had been made under its previous acts, to prescribe a new method of deciding the question, or to refuse to determine it altogether."

While the facts in the Wallace-Adams case are different from those of the case at bar, yet the principle involved is the same, and the law, as enunciated in that decision, is applicable to and controlling of the question in the case at bar.

Thus it is seen that the question of determining citizenship was purely legislative and not judicial, and had been taken away from the Five Civilized Tribes by the Congress of the United States. Under that act, Congress assumed the power and claimed the right to determine who were citizens of the various tribes, and, in exercising this power, acted through the Commission to the Five Civilized Tribes, reserving the right to review all its decisions, by those aggrieved, in the United States courts; and in speaking of this phase of the subject, Judge Sanborn, in *Wallace v. Adams, supra,* 143 Fed. on page 726, 74 C. C. A. on page 550, uses the following language:

"The suggestion that the citizenship court was a commission, and not a judicial tribunal, is immaterial, because the power of

the legislative department of the government to authorize the review of the judgments of citizenship by a *commission,* a *committee,* or an *agent* was as complete as it was to authorize that review by a court.   It had plenary authority to review the judgments itself, or to create or select a tribunal to its liking for the purpose.   *   *   *   The power conferred upon the Dawes Commission and the United States courts in the Indian Territory by the act of June 10, 1896, and upon the Supreme Court by the act of July 1, 1898, to determine who are citizens of the Choctaw and Chickasaw Nations, was *legislative* and not *judicial;* and all judgments and proceedings thereunder were subject to any subsequent legislation of the United States, respecting the question of citizenship, which was enacted before allotments of land were made to the successful litigants under the previous legislation.   Claimants of citizenship who secured judgments in their favor which were final under the acts of 1896 and 1898, when they were rendered, and took possession of, and demanded suitable tracts of, land as their allotments, before their judgments were made reviewable, acquired no vested rights therein against subsequent legislation enacted before the lands were allotted to them.   The judgments of citizenship rendered by the courts were conclusive upon the parties to them, in the absence of subsequent legislation; *but, though final when rendered, they were voidable and reviewable by subsequent acts of Congress passed before allotments of land were made under them.*"

Counsel for plaintiff contends that, inasmuch as the Commission to the Five Civilized Tribes permitted plaintiff to make his selection of allotment, and place thereon his tentative filing, it must be taken as proof that the Commission found that he was the son and descendant of W. H. Robinson, and therefore had a right to take under his father; and at the same time plaintiff insists that, after having permitted the tentative filing, the Commission and the Secretary of the Interior had no power to cancel the same, because, as he contends, this was a judicial act, which neither the Commission nor the Secretary had the power to perform; that having been settled by the decree of the Court of Claims.

The decree of the Court of Claims, which counsel for plaintiff seemingly relies upon, was entered in a suit brought for the purpose of testing the legality of the so-called "Blood Laws" of

the Cherokee Nation, which prohibited freedmen from participating in the distribution of certain funds arising from the sale of land, commonly known as the Cherokee Outlet. This decree holds that these laws violated the treaty of 1866, because they made no distinction between those citizens who were residents of the Cherokee Nation at the time the treaty was signed, or who returned within six months after the adoption of the treaty, *and those who lost their citizenship by a failure to comply with the terms of the treaty.* The decree decided only as to the freedmen who instituted that suit, and as to them it holds that they were entitled to be enrolled as citizens, but does not attempt to adjudicate the claims of those who had not complied with the terms of said treaty. The other question settled by that decree had reference solely to the particular individuals who should, or should not, be allowed to participate in the distribution of the funds derived from the sale of the Cherokee Outlet. The provision in the Curtis act that the roll of Cherokee freedmen should be made in conformity with the decree of February 3, 1896, shows that it was not intended to accept the roll made by the Commission, provided for in said decree, or to ratify the same. The Commission to the Five Civilized Tribes was authorized and instructed by the provisions of the Curtis act to make a roll, independent of any other roll, except the one made by the Cherokee Nation, in 1880, limited and guided in that duty by the interpretation placed upon the treaty of 1866 by the Court of Claims; that is:

"Enroll all Cherokee freedmen who have been liberated by voluntary act of their former owners, or by law, as well as all other colored persons who were in the Cherokee country at the commencement of the War of the Rebellion, and were residents therein at the date of the treaty, or who returned thereto within six months thereafter and their descendants, and all those whose names appear on the 1880 roll and their descendants." (Defendant's Brief, page 9.)

Now, as to the power of the Commission to the Five Civilized Tribes to deal with this subject-matter, we find, on page 721, 143 Fed., on page 545, 74 C. C. A., *Wallace v. Adams, supra,* the following language:

"The Commission [speaking of the Dawes Commission], un-der the direction of the Secretary, constitutes a special tribunal, vested with the judicial power to hear and determine the claims of all parties to allotments of these lands, and to execute its judg-ments by the issue of the allotment certificates, which constitute conveyance of the right to the lands to the parties who it decides are entitled to the property. This tribunal undoubtedly has ex-clusive jurisdiction to determine such claims and to issue such a conveyance. The allotment certificate, when issued, like a patent to land, is dual in its effect. It is an adjudication of the special tribunal empowered to decide the question that the party to whom, it issues is entitled to the land, and it is a conveyance of the right to this title to the allottee."

Thus it was seen that in a case like the one under considera-tion the Commission had ample authority to investigate the facts and to determine the question of citizenship, as well as to order the cancellation of the tentative filing of the plaintiff, and inasmuch as the filing was canceled and a patent to the land in question was thereafter duly issued to Parsons, it follows that it was not susceptible of collateral attack by plaintiff; but, if it can be shown that the Commission or the Secretary of the Interior had been induced to issue the patent by an erroneous view of the law, or by gross mistake of fact, the matter might be reopened, and if conditions warranted, the patent would be can-celed. But counsel has failed to point out in his brief, and we have been unable to find by careful research, any authority that would warrant us in saying that the action of the Commission and the Secretary of the Interior was influenced in any way by an erroneous construction of the law applicable to this case, and he does not pretend to say that there was such a gross mistake of fact as would warrant an interference by a court of equity.

We do not desire to be understood as saying that the action of the Commission and the Secretary of the Interior in this case cannot be inquired into by a court of equity. On the contrary, it has been definitely settled in this state, and by this court, that equity will furnish an ample and effective method of correcting any mistakes occasioned by an erroneous construction of law, or

a gross mistake of fact.   In *Garrett et al. v. Walcott et al.,* 25 Okla. 574, 106 Pac. 848, it was held that:

"If the Commission and the Secretary have been induced to cause to be issued a patent to the wrong party by an erroneous view of the law, or by gross or fraudulent mistake of the facts, the rightful claimant may cause such decision to be avoided, and charge the legal title to the lands in the hands of the allottee with his equitable title to it, upon the ground that upon the facts found, conceded, or established, without dispute, at the hearing before this special tribunal its officers fell into error as to the law applicable to the case, which caused them to refuse to have issued the patent to him and give it to another, or through fraud or gross mistake it fell into a misapprehension of the facts proved before it, which had a like effect."

However, no such conditions exist in this case; there was no gross mistake of fact, and the law applicable to the case was properly construed and properly applied.

The view taken by the Commission to the Five Civilized Tribes of that portion of the decree of the Court of Claims complained of by the plaintiff is the only reasonable construction, to our mind, that the decree will stand, and, inasmuch as the question of citizenship of plaintiff's father was, on March 11, 1904, decided adversely to him by the Commission to the Five Civilized Tribes, and it appears that by authority of *Wallace v. Adams, supra,* said Commission was clothed by act of Congress with full and complete power to act in the premises, and inasmuch as the tentative filing on the claim of land as an allotment before the issuance of a certificate or patent creates no vested right in the claimant, and the question of citizenship, by act of Congress, had been removed from the consideration of the Cherokee Nation and lodged in the Commission to the Five Civilized Tribes, where it was exercised, and where plaintiff's claims were denied, we are forced to the inevitable conclusion that the petition states no cause of action, and the court did not err in sustaining the demurrer to the same.   Having reached this conclusion, it is unnecessary to investigate the other assignments of error.

The judgment of the district court of Washington county should therefore be affirmed.

By the Court:   It is so ordered.

All the Justices concur.